In re Lester L. ROBINSON, Debtor.

**FIRST COMMERCIAL BANK, Plaintiff,**

v.

**Lester L. ROBINSON, Defendant.**

**Bankruptcy No. 93–06127–TBB.**
**Adv. No. 93–00551.**

United States Bankruptcy Court,
N.D. Alabama,
Southern Division.

Feb. 13, 1996.

William A. Ratliff, Jay Clark, Wallace, Jordan, Ratliff, Byers and Brandt, Birmingham, AL, for plaintiff.

Troy L. Grayson, Birmingham, AL, for defendant.

## MEMORANDUM OPINION

THOMAS B. BENNETT, Bankruptcy Judge.

### I. *The Road to Trial*

Having filed a petition under chapter 7 of the Bankruptcy Code on September 10, 1993, Lester L. Robinson, the defendant-debtor ("Robinson") in this matter, put in motion a sequence of events one of the first of which required his creditors to assess whether a basis existed to contest all or a portion of the discharging of his debts. The conundrum for his creditors was whether to expend additional monies and effort to obtain a judgment preserving what is not now collectible in the hope that one day it might be. On December 13, 1993, one of Robinson's creditors, First Commercial Bank ("Bank"), took the first public steps down the lengthy road to trial by filing a complaint against Robinson seeking to have a debt determined to be nondischargeable under 11 U.S.C. § 523(a)(2)(B): the extension, renewal, or refinancing of credit obtained by a use of a materially false, written financial statement. In March, 1994, the Bank sought and was allowed to amend its complaint. This necessitated that Robinson respond by an amended answer. However, Robinson strategically added a demand for a jury trial.

The Bank redounded to the jury demand by a motion to strike. This the Court denied by order dated March 22, 1994. Disagreeing with the denial, the Bank filed a motion to reconsider which was denied by this Court in May, 1994. Ever hopeful of victory, the Bank by a second motion to reconsider sought that a jury trial be denied Robinson. Its hope was again not realized by yet another denial of its request.

In August, 1994, the Bank was allowed a second amendment to its complaint to further define its claim for the exception to discharge. In an attempt to avoid trial, Robinson requested summary judgment. Within a week of Robinson's motion for summary judgment, the Bank sought partial summary judgment to establish the amount of debt owed. On October 28, 1994, the Court denied Robinson's request for summary judgment and granted the Bank partial summary judgment establishing the amount owed for dischargeability purposes at $202,675.36, excluding attorneys' fees, costs, and interest from that date forward.[1] The issues deter-

---

1. Opinions of various courts indicate disagreement over the amount of a debt which is nondischargeable under § 523(a)(2)(B). Some have held that on renewal of a loan only new money extended in reliance on a false financial statement is nondischargeable. Others have taken a different stance and have held the entire debt is nondischargeable where the creditor reasonably relied on a false financial statement in renewing or refinancing an existing loan. *Compare Siriani v. N.W. Nat'l. Ins. Co.* (*In re Siriani*), 967 F.2d 302 (9th Cir.1992); *TranSouth Fin. Corp. v. Johnson* 931 F.2d 1505, 1507 (11th Cir.1991); *Household Fin. Corp. v. Greenidge* (*In re Greenidge*), 75 B.R. 245 (Bankr.M.D.Ga.1987), *with Norris v. First Nat'l. Bank* (*In re Norris*), 70 F.3d 27, 29

minative of dischargeability were reserved for trial. However, the opposing parties were not ready to do battle at trial.

The October 28, 1994, order included an agreement to send the adversary proceeding to the District Court for a trial on the remaining exception to discharge issues. By order entered November 3, 1994, the case was certified to the District Court. Constant in its belief that Robinson should not be accorded a jury trial, the Bank sought the District Court's striking of Robinson's jury demand. This time the Bank prevailed and the District Court returned the adversary proceeding to this Court for a bench trial on the exception to discharge issues. By the time this case returned to the Bankruptcy Court, two Bankruptcy Judges and one District Court Judge had heard and ruled on portions of it. As the day of trial approached, Robinson filed in September, 1995, a second motion for summary judgment with the third Bankruptcy Judge assigned this case. This motion, too, was denied.

On October 17, 1995, the pretrial skirmishes ended and the trial commenced. However, the procedural sorties did not cease. In addition to the barrage of evidentiary motions by both sides, Robinson requested a directed verdict at the conclusion of the Bank's case in chief and the end of the trial. Both were denied.

## II. The Factual Events

Trial—just as a battle—does not always proceed according to one's strategic plan. A party with the burden of proving facts to a level of legal certainty is sometimes assisted by the opposing party. The help may be the intentional or inadvertent proof of a necessary fact. As in this case, it may also be in a more subtle, yet equally effective form: absence of credibility of a witness when compared to that of others. In this case where the Bank must prove its entitlement to have Robinson's debt excepted from discharge by a preponderance of the evidence, findings of fact with respect to critical elements disputed by Robinson were resolved by the balancing of the credibility of Robinson relative to that of witnesses called by the Bank and Robinson. As this opinion evidences, Robinson's credibility is lacking. A telling factor regarding his credibility—or lack thereof—is no substantial facts or arguments were presented disputing the falsity of the financial statements upon which the Bank's claims are predicated. The result is that Robinson assisted the Bank in meeting its burden of proof by displacing the evidentiary imbalance in his favor had equality of credibility existed. The greater weight thus accorded the evidence proffered by the Bank tilted the initial unfavorable imbalance to one favoring it. It is in this context that essential factual events have been established.

From the mid–1980's, Robinson had an established relationship with Cahaba Bank and Trust, located in Trussville, Alabama. In 1988, the Bank acquired the assets and loan portfolio of Cahaba Bank and Trust. The evidence is unclear regarding the form of business acquisition which occurred. Afterwards, Robinson continued conducting business with the Bank at the Trussville branch. Initially, Robinson dealt with one of the Bank's loan officers, Danny Boyd. In the summer of 1990, Don Garvich ("Garvich") was transferred to the Trussville office and commenced handling Robinson's various accounts. Garvich is currently a vice-president

---

(5th Cir.1995); *Shawmut Bank, N.A. v. Goodrich* (*In re Goodrich*), 999 F.2d 22 (1st Cir.1993); *John Deere Co. v. Gerlach* (*In re Gerlach*), 897 F.2d 1048 (10th Cir.1990). In part, this divergence of holdings has been created by some court's views on whether proximate cause is an affirmative defense to all or part of the amount which may be excepted from discharge. *Compare Norris*, 70 F.3d at 29 n. 6; *TranSouth Fin. Corp.*, 931 F.2d at 1507, *with Collins v. Palm Beach Sav. & Loan* (*In re Collins*), 946 F.2d 815, 816 (11th Cir.1991).

Even if Robinson had asserted such a defense in response to the Bank's second amended complaint, it does not assist him. Insufficient evidence was presented by Robinson to prove such an affirmative defense. Also, the causation evidence presented by the Bank demonstrates causation meeting the *Collins* standard. As a result, this Court does not need to resolve whether *Collins* allows such a defense under 11 U.S.C. § 523(a)(2)(B). *See Norris* 70 F.3d at 29 n. 6. Likewise, it avoids the apparent conflict between *TranSouth* and *Collins*. *Compare TranSouth Fin. Corp.*, 931 F.2d at 1507, *with Collins* 946 F.2d at 816. For these reasons and in light of the October 29, 1994 order granting the Bank's motion for partial summary judgment and establishing the dollar amount to be excepted from discharge should Robinson's debt to the Bank be held nondischargeable, the amount to be excepted from discharge is not redetermined.

and the branch manager of this office. In contradistinction to Robinson, Garvich was a highly credible witness.

In early 1991, Garvich and Robinson discussed restructuring and renewing Robinson's line of credit which was evidenced in part by two promissory notes. In connection with this transaction, Garvich requested a current financial statement from Robinson and received one dated January 15, 1991. He reviewed this financial statement as well as other information in the credit file including memoranda written to the file each time a loan had been made to Robinson. These typically contained a description of the transaction, Robinson's financial situation, the collateral securing the loan, the Bank's relationship with Robinson, and his outstanding debts. When Garvich extended or renewed credit to any borrower, he followed the Bank's and his practice of examining the borrower's credit file maintained by the Bank, the financial statement, the relationship with the Bank, outstanding debt, and available collateral. Other factors relevant to and which varied by transaction would also be reviewed to determine whether the Bank should extend credit. Normally, the Bank did not verify financial statements supplied by a borrower. For the restructuring which was finalized on April 22, 1991, and a later, August 6, 1992, renewal, Garvich followed the Bank's customary procedures.

After receiving the January 15, 1991 financial statement, Garvich discussed its contents with Robinson and made notes on its margins. Garvich's review of the January 15, 1991 financial statement disclosed that Robinson's net worth had not changed significantly from that set forth in previous statements. Based in part on the information set forth in this financial statement, the line of credit was increased. On April 22, 1991, the notes evidencing the line of credit restructuring were renewed and placed on a fixed term. The line of credit was secured in part by a second mortgage on rental property.

As Robinson's restructured line of credit's due date approached, Garvich and Robinson had what has become a critical conversation. In July or August, 1992, Garvich questioned Robinson about his financial condition and whether it had changed from that reflected in the January 15, 1991 financial statement. Robinson orally responded that his financial situation had not changed. Garvich requested from Robinson a more current financial statement for use in evaluating the renewal of the line of credit. However, the requested financial statement was not received prior to the renewal.

On August 6, 1992, and based in part on its reliance on the January 15, 1991 financial statement coupled with Robinson's oral reaffirmation of its continued accuracy, the Bank again renewed the line of credit. The two notes which had evidenced the line of credit debts were incorporated into one master note in the principal amount of $187,549.15. The loan was again secured in part by rental property.

Subsequent to this renewal, Robinson complied with the request for a newer financial statement. In September, 1992, the Bank received one dated September 10, 1992. Following receipt of the statement, Garvich again reviewed Robinson's credit file. He found the September 10, 1992 financial statement to be consistent with the one dated January 15, 1991. The assets and liabilities were about the same. The January 15, 1991 statement listed a net worth of $588,755.00 while the September 10, 1992 statement listed a net worth of $542,895.00.

Had the Bank known the true state of Robinson's financial affairs, it would not have renewed the line of credit and it would have defaulted and accelerated repayment of the debt. This the Bank had as one of its contractual rights and options. The August 6, 1992 line of credit loan documents contain default and acceleration provisions providing that the borrower defaults upon the happening of specified events. One is when any representation made by the borrower is false or misleading. Another such event is a material change in the conditions or affairs (financial or other) of the borrower. Upon the occurrence of such defaults, the Bank is allowed to accelerate repayment of the indebtedness. Substantially identical provisions are contained in predecessor loan documents evidencing the renewal of Robinson's line of credit.

The contents, preparation, and use of the January 15, 1991 and the September 10, 1992 financial statements by Robinson and the Bank impact on resolution of this case. Robinson testified that he did not authorize the preparation of either statement. He contended that he did not provide David Bledsoe ("Bledsoe"), a certified public accountant, with information to prepare either statement. He also has asserted that he did not review the statements and did not request that they be sent to the Bank.

Despite Robinson's having held positions of trust and respect in the community—a police officer and pastor of a church, his demeanor and contradicted testimony placed into question his accuracy and caused the discounting of his credibility. Robinson professed lapses of memory, asserted absences of recollection, and made equivocal denials when questioned about events involving his loan transactions and the financial statements. Certain of Robinson's testimony was inconsistent with prior testimony at trial and that given under oath at prior proceedings including his first meeting of creditors. Robinson's accountant, Bledsoe, testified that he prepared both statements based on information received from Robinson and that his practice was to prepare a financial statement only at a client's request. To his counsel's chagrin, Robinson testified that he was the only person who could have given sufficient information to Bledsoe to enable him to prepare both statements. The credible evidence is that Robinson supplied the information used by Bledsoe and requested that Bledsoe prepare the January 15, 1991 and September 10, 1992 financial statements. He also delivered or caused the financial statements to be delivered to the Bank. Both were received by the Bank, reviewed, and placed in Robinson's credit file.

The January 15, 1991 financial statement misrepresents Robinson's net worth by an amount exceeding $210,000.00. Robinson falsely represented his assets on the statement. He knowingly overvalued his residence and an adjacent ten acres. He represented that a vacant lot owned by him which is located at 2920 10th Avenue North was unencumbered when, in fact, it was encumbered. Also, fourteen lots identified as being located on Red Hollow Road were included as an asset with substantial equity. However, Robinson never owned even one of these lots.

The September 10, 1992 financial statement also discloses a false net worth for Robinson. This time the intentional misstatement is over $214,000.00. Robinson overstated his assets. He represented that he owned one-half of the outstanding stock of an entity known as Thrift Auto Mart which was valued at $25,000.00. In fact, he had sold this stock before the September, 1992 statement was compiled. Robinson represented that he owned fifty percent of Air Control, Inc. valued at $20,900.00. To the contrary, this company was dissolved before the January 15, 1991 statement was issued and it never had value. Robinson represented that he owned half of Investor's Coop., Inc. and valued the business at $59,000.00. In testimony prior to trial, he asserted it had not conducted business. At trial, he contended that Investor's Coop. had conducted business but claimed that the business did not have assets. The facts are that Investor's Coop. never conducted business and Robinson's ownership interest had no value. Robinson also represented that his residence was worth $145,000.00 subject to a $95,000.00 mortgage, and he valued ten acres adjoining it at $60,000.00. His bankruptcy schedules disclose Robinson having placed different values on these properties: his residence plus the surrounding acreage is valued at $97,000.00. Robinson testified that he overstated the value of his residence and the adjoining acreage in the financial statement. He also failed to disclose that his residence was jointly owned.

Whether one uses the January 15, 1991 financial statement or the September 10, 1992 financial statement, Robinson substantially overstated his net worth. For the 1991 financial statement, the overstatement exceeded 55% and for the 1992 financial statement it exceeded 65% of what should have been disclosed to the Bank. Equally egregious as his falsification of his net worth are the significant and multiple entries in both statements which Robinson knew to be false

regarding his assets, their value, and his liabilities. Robinson knowingly caused these statements to be given to the Bank for its use in connection with the August, 1992 renewal of and subsequent forbearance with respect to the debt incurred by him.

### III. The Legal Standard For Exception of Robinson's Indebtedness to the Bank

Section 523 of the Bankruptcy Code provides specific exceptions to the general rule that debts are dischargeable in bankruptcy. The Bank relies on 11 U.S.C. § 523(a)(2)(B) as the basis to deny dischargeability of a debt owed to it by Robinson. Section 523(a)(2)(B) provides that

"(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

\* \* \* \* \* \*

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; ..."

The Bank has the burden of proving each element by a preponderance of the evidence. *Norris v. First Nat'l. Bank (In re Norris )*, 70 F.3d 27, 29 (5th Cir.1995); *Equitable Bank v. Miller (In re Miller )*, 39 F.3d 301, 304 (11th Cir.1994).

In determining dischargeability, exceptions to discharge are liberally construed in favor of Robinson and against the Bank. The reasons for denying the discharge must be real and substantial. The nondischargeability provision must be read narrowly to provide an honest, but unfortunate debtor a fresh start. *See Miller,* 39 F.3d at 304;

*TranSouth Fin. Corp. v. Johnson,* 931 F.2d 1505, 1508 (11th Cir.1991); *see also First Int'l. Bank v. Kerbaugh (In re Kerbaugh )*, 162 B.R. 255 (Bankr.D.N.D.1993). The liberality rule does not apply once the creditor sufficiently demonstrates for § 523(a)(2)(B) purposes the debtor's dishonesty. *Jennen v. Hunter (In re Hunter )*, 771 F.2d 1126, 1130 (8th Cir.1985); *cf. Collins v. Palm Beach Sav. & Loan (In re Collins )*, 946 F.2d 815, 817 (11th Cir.1991).

At least two bases exist to hold Robinson's debt to the Bank nondischargeable.[2] The first is based on Robinson's reaffirmance of the January 15, 1991 financial statement. The Bank renewed credit in reliance on the materially false January 15, 1991 written statement respecting Robinson's financial condition which he made or published with the intent to deceive. Although the statement had been prepared almost twenty months prior to the August 6, 1992 renewal, Robinson's representation that his financial condition had not changed eliminates his argument that this financial statement is outside the time period within which the Bank could have reasonably relied on its contents. The second basis is the Bank's forbearance based on the September 10, 1992 financial statement.

#### A. Renewal and Forbearance

Section § 523(a)(2)(B) is explicit that a debt may be nondischargeable if it is, among other things, a renewal of an extension of credit. The August 6, 1992, transaction was a renewal of credit within the meaning of § 523(a)(2)(B). Coupled with the clear unequivocal language of § 523(a)(2)(B) placing renewal of credit within the perimeters of nondischargeability is the consistent, though scant, case law addressing this issue. *See, e.g., Norris,* 70 F.3d at 29; *Shawmut Bank, N.A. v. Goodrich (In re Goodrich )*, 999 F.2d 22, 24 (1st Cir.1993).

So, too, is a forbearance. Not defaulting and not accelerating a note are extensions of credit within the purview of 11

---

2. In light of the ruling set forth in this opinion, whether the April 22, 1991 renewal based on the material falsity of the January 15, 1991 financial statement constitutes an independent basis supporting the exception to discharge of the line of credit is not resolved at this time.

U.S.C. § 523(a)(2)(B). *See Marine Bank S.W.N.A. v. Hoffman (In re Hoffman )*, 80 B.R. 924, 927 (Bankr.N.D.Ill.1988); *First Fed. Sav. & Loan Ass'n. v. Mancini (In re Mancini )*, 77 B.R. 913, 915 (Bankr.M.D.Fla. 1987). The facts are clear. When the August 6, 1992, loan was renewed, Garvich requested an updated financial statement which was subsequently provided. Based on his review of the misrepresented state of affairs set forth in this financial statement, the Bank did not default and accelerate repayment of the line of credit. In effect, it continued to extend credit when it otherwise would not have done so.

### B. The Writing Respecting Robinson's Financial Condition

For Robinson's debt to the Bank to be nondischargeable under § 523(a)(2)(B), a written statement must have been utilized. *Equitable Bank v. Miller (In re Miller )*, 39 F.3d 301 (11th Cir.1994). Both the January 15, 1991 and the September 10, 1992 financial statements meet this requirement.

Under § 523(a)(2)(B)(ii), these statements must also be ones respecting Robinson's financial condition. *Miller*, 39 F.3d at 304. Both indisputably are. Each is titled as a statement of financial condition and each sets forth what Robinson contended were his then assets, liabilities, and net worth.

### C. The Material Falsity of Robinson's Disclosures

Robinson's financial statements are materially false under § 523(a)(2)(B)(i) if they contain substantially untruthful information of a type which normally would bear on the Bank's credit making decision. *Norris*, 70 F.3d at 29 n. 10; *Jordan v. S.E. Nat'l. Bank (In re Jordan )* 927 F.2d 221, 224 (5th Cir.1991); *Kerbaugh*, 162 B.R. at 262. Both financial statements contain false information meeting this standard. Robinson significantly overstated his net worth: by more than 55% in the January 15, 1991 statement. He overvalued his home and the ten acres surrounding it. He failed to note that his home was jointly owned. He represented that a lot located at 2920 10th Avenue North, Birmingham, Alabama was unencumbered when a mortgage existed, and he represented that

he owned fourteen lots which he never owned.

Robinson falsified his net worth in the September 10, 1992 statement by in excess of $214,000.00. He represented that he owned stock in Thrift Auto Mart even though he sold his stock before the statement was compiled. He represented that his interest in Air Control, Inc. was worth $20,900.00 even though the company had been dissolved before the 1992 statement was compiled and the stock never had any value. He represented that his ownership interest in Investor's Coop, Inc. had value when it was worthless. Robinson again overstated the value of his home and the ten acres adjoining it, and he failed to disclose that his home was jointly owned. From the context of Robinson's line of credit dealings with the Bank, the degree of falsity of the information set forth in both statements is substantial and had a bearing on the Bank's renewal of the line of credit and on the Bank's forbearance.

### D. Reliance or Not

For the debt to be nondischargeable, the Bank must have reasonably relied on Robinson's financial statement. 11 U.S.C. § 523(a)(2)(B)(iii). What is required is actual and reasonable reliance. *See Ins. Co. of N. Am. v. Cohn (In re Cohn )*, 54 F.3d 1108, 1115 (3rd Cir.1995); *Kerbaugh*, 162 B.R. at 264; *High Springs Bank v. Sandlin (In re Sandlin )*, 39 B.R. 936 (Bankr.M.D.Fla.1984). The determination of reasonableness is made from the panorama of the totality of the circumstances of the Robinson–Bank credit transaction. *See Young v. Nat'l. Union Fire Ins. Co. (In re Young )*, 995 F.2d 547 (5th Cir.1993).

#### 1. Actual Reliance

Actual reliance is reliance in fact. The Bank does not have to demonstrate that a financial statement was the only factor influencing its credit making decision. Partial reliance is all that is needed. *See Cent. Nat'l. Bank & Trust Co. v. Liming (In re Liming )*, 797 F.2d 895, 898 (10th Cir.1986); *Kerbaugh*, 162 B.R. at 265; *Sandlin* 39 B.R. at 937. Garvich testified that he examined the January 15, 1991 statement. He made

notes on it based on a discussion with Robinson and he relied on it in making the August 6, 1992 renewal. The Bank's actual reliance on the January 15, 1991 statement is beyond cavil.

The same is true for the September 10, 1992 financial statement. Garvich examined the Bank's credit file. He compared the September 10, 1992 statement to prior financial statements and found it consistent. Based on this receipt and review, the Bank did not default and accelerate the loan.

### 2. Reasonable Reliance

■ Several factors need to be ascertained under the totality of circumstances review of whether a creditor's reliance was reasonable: the circumstances at the time of the transaction, the creditor's standard business practices, the standards and customs of the industry, and the duty to investigate. *See Cohn*, 54 F.3d at 1117; *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257 (5th Cir.1993); *see also Kerbaugh*, 162 B.R. at 265.

Since the 1980's, Robinson had conducted business with the Bank and its predecessor. Robinson worked almost exclusively with two loan officers. He had a long term depository and lending relationship. He had multiple loan transactions extending from not later than 1988 to at least August 6, 1992. Robinson made his payments regularly. Prior to December, 1992, he had never failed to make required payments on any extension of credit by the Bank.

When renewing a loan or extending credit, the Bank's standard business practice was to request a financial statement. The loan officer would review the financial statement, the credit file, the relationship with the individual, outstanding debt, available collateral, and other relevant factors. The loan officer would not typically verify the information set forth in a financial statement.

The Bank followed its standard practice when it renewed Robinson's loan on August 6, 1992, based on the January 15, 1991 statement. Garvich reviewed the January 15, 1991 financial statement and discussed it with Robinson. Based on Robinson's oral representation that his financial condition had not changed, Garvich was lead to believe that the statement was current. Garvich renewed the debt based in part on the January 15, 1991 statement, a review of the credit file, and the long term relationship with Robinson. Garvich also ran a credit check on Robinson.

■ Robinson asserts that reliance on the January 15, 1991 financial statement was unreasonable based on the age of the statement.[3] He contends that the statement was stale. However, Robinson's oral representation that his financial condition had not changed since that set forth in the January 15, 1991 statement defeats this argument. The oral reaffirmation brought the financial statement current and cured any staleness. *See Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163 (6th Cir.1985); *Bidwill v. Hannegan (In re Hannegan)*, 155 B.R. 205 (Bankr.E.D.Mo.1993).

The quintessence of the testimony of Robinson's banking expert witness, Gerald Tucker, was that he would have acted as the Bank did and renewed the line of credit. Thus, the Bank followed its standard practice and the industry standard when it renewed Robinson's line of credit. Given this state of facts, the Bank's reliance on the statement was reasonable.

Just as the Bank's reliance on the January 15, 1991 financial statement for renewal of the line of credit was reasonable so was its forbearance based on the September 10, 1992 financial statement. The Bank followed its standard practice with regard to the September 10, 1992 financial statement. Garvich reviewed the credit file and the statement.

---

**3.** Robinson alleges that the January 15, 1991 financial statement which was around twenty months old was stale and any reliance on such statement was unreasonable. In support of this argument, Robinson cites several cases for the proposition that a bank's reliance on a stale financial statement without inquiry as to whether the statement reflects the debtor's current financial situation is unreasonable. *See Allstate Ins. Co. v. Delgado (In re Delgado)*, 151 B.R. 618 (Bankr.S.D.Fla.1993); *Barnett Bank v. Ogden (In re Ogden)*, 119 B.R. 277 (Bankr.M.D.Fla.1990). Since the Bank inquired about the then current accuracy of the financial statement, this caselaw is inapposite.

He compared it to the January 15, 1991 statement. The September 10, 1992 statement was consistent with the January 15, 1991 statement. No obvious problems were discernable to Garvich from his review.

Additionally, the Bank did not have a duty to investigate either the January 15, 1991 or the September 10, 1992 statements. The financial statements are not obviously false or facially incomplete and the Bank's loan officer's review did not suggest any falsity or incompleteness. *Norris,* 70 F.3d at 30; *Kerbaugh,* 162 B.R. at 265.

Further supporting the reasonableness of the Bank's reliance are Robinson's positions of trust in the community, his long term relationship, and previously unblemished relationship with the Bank. Robinson's contentions that the Bank did not actually and/or reasonably rely on the January 15, 1991 statement in renewing the line of credit in August, 1992, and on the September 10, 1992 statement in forbearing from calling it after renewal are contrary to the true state of affairs at the time of renewal and of forbearance.

### E. Robinson Caused, Made, or Published with the Intention of Deceiving the Bank

■■■■ Before excepted from discharge, Robinson is required under 11 U.S.C. § 523(a)(2)(B)(iv) to have caused the financial statements to be made or published with the intent to deceive the Bank into renewing and/or forbearing from calling the line of credit. To determine intent to deceive, one also looks to the totality of the circumstances, including the recklessness of Robinson's actions. Robinson's intent may be inferred. "Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inference [sic] of intent [to deceive]." *Miller,* 39 F.3d at 305 (quoting *In re Albanese,* 96 B.R. 376, 380 (Bankr.M.D.Fla.1989) (citations omitted)).

Robinson contends that he did not make, publish or cause either financial statement to be prepared. He stated that he did not ask Bledsoe, his accountant, to prepare either statement, and he did not provide Bledsoe with the requisite information. However, Robinson was the only person who could have provided Bledsoe with all of the information necessary to prepare the statements and which was set forth in them. Bledsoe testified that he received information from Robinson and that he did not prepare statements except at a client's request. Again, the credible evidence is that Robinson caused both financial statements to be prepared and given to the Bank. The magnitude of the falsity coupled with Robinson's being the source of the information and his repeated use of false financial statements plainly demonstrate Robinson's intent to deceive the Bank.

### IV. *Nondischarged Debt Plus*

■■■■ The parties stipulated that if the Bank prevailed, reasonable attorneys' fees would be fifteen percent of the nondischargeable debt. The Bank having succeeded in proving the nondischargeability of Robinson's line of credit debt may recover attorneys' fees under 11 U.S.C. § 523(d) if the contract between it and Robinson provides for such fees and it is enforceable. *See TranSouth Fin. Corp. v. Johnson,* 931 F.2d 1505 (11th Cir.1991); *Martin,* 761 F.2d at 1168; *Jennen v. Hunter (In re Hunter),* 771 F.2d 1126 (8th Cir.1985). It does and it is.

Of the line of credit loan documents, the August 6, 1992, note contains a clause under the terms of which Robinson agreed to pay costs and reasonable fees incurred by the lender in collecting on the note. The validity and enforceability of this provision has not been contested by Robinson.

### V. *Dual Basis of Robinson's Nondischargeable Liability*

The Bank presented two theories of nondischargeability under 11 U.S.C. § 523(a)(2)(B). One based on the Bank's renewal of credit and the other on its forbearance in defaulting and accelerating repayment of an extension of credit. The Bank prevails under both theories. The debt, $202,675.36, is nondischargeable. The Bank is also to receive attorneys' fees equal to fifteen percent of the nondischargeable debt, or $30,401.30, for a total of $233,076.66 plus

interest at the rate specified under 28 U.S.C. § 1961 from the date of entry of judgment.

Victory in trial just as in battle is not synonymous with winning a war. Now that the battle at trial has concluded, post-trial battles will determine how much longer the road to be travelled in this Bank–Robinson war will continue. They will also reveal whether this debtor-creditor war ends in victory by collection of a judgment or in one reminiscent of that achieved by Pyrrhus. At this juncture in the sequence of events, all that has occurred is a ruling of a nondischargeability which is to be embodied in judgment order.