159 F.3d 963
 33 Bankr.Ct.Dec. 498, Bankr. L. Rep. P 77,837
 In re Gary Oliver CAMPBELL, Debtor.
Marvin I. WOLF, Individually and as Trustee of the Samuel
Wolf Trust, and Augusta Wolf, Plaintiffs-Appellees,
v.
Gary Oliver CAMPBELL, Defendant-Appellant.
 No. 97-1540.
 United States Court of Appeals,
Sixth Circuit.
 Argued and Submitted Aug. 4, 1998.
Decided Nov. 4, 1998.
 
 Dennis Watson (argued and briefed), Fried, Watson & Bugbee, Bingham Farms, MI, for Appellees.
 Gary Oliver Campbell (briefed), Ann Arbor, MI, for Appellant.
 Before: MERRITT, KENNEDY, and GILMAN, Circuit Judges.
 MERRITT, J., delivered the opinion of the court, in which GILMAN, J., joined. KENNEDY, J. (pp. 967-69), delivered a separate opinion concurring in part and dissenting in part.
 OPINION
 MERRITT, Circuit Judge.
 
 
 1
 This appeal presents a technical issue under the dischargeability provision of the bankruptcy law: whether a fraudulently obtained new promise to forbear on an unpaid, nonfraudulent, dischargeable old indebtedness should render the new extension of credit nondischargeable, even though the creditor may in fact be no worse off economically as a result of the fraudulent refinancing. We conclude that § 523(a)(2)(B) of the Bankruptcy Code which precludes discharge of a debtor from any "extension, renewal, or refinancing of credit, to the extent obtained by" a false written statement, means that such a new extension of indebtedness is nondischargeable even though the creditor is unable to show additional damages arising therefrom.[1] Otherwise, an insolvent debtor would have no legal incentive to be truthful in obtaining refinancing. In so holding, we follow the well-reasoned opinion of Judge Boudin for the First Circuit in In re Goodrich, 999 F.2d 22 (1st Cir.1993), and his explanation of the legislative history and purpose of § 523.
 
 I.
 
 2
 Gary Campbell furnished false financial statements regarding his company's financial condition to Marvin and Augusta Wolf in an effort to procure their forbearance from collection on a defaulted note. After reviewing the false documents, the Wolfs negotiated new repayment terms with Campbell and conditionally agreed to forbear. Campbell failed to make an interest payment required under the new terms, and the Wolfs sued to collect the amount he still owed them. The Wolfs' lawsuit was stayed after Campbell and his company filed for bankruptcy. The Bankruptcy Court held that Campbell's debt was dischargeable, but the District Court reversed. Campbell's appeal seeks to raise two questions concerning the scope of 11 U.S.C. § 523(a)(2)(B). The first question is whether forbearance from collection is a "debt ... for money, property, services, or an extension, renewal, or refinancing of credit," and the second is whether the statute requires the creditor to establish "damages" in the sense that the false statement induced it to give up a valuable collection remedy.
 
 
 3
 Before 1990, the Wolfs held approximately nineteen percent of the stock of the Unisource Foods Corporation. During the 1980s, the Wolfs filed two lawsuits against Unisource's majority shareholders in state court. Campbell was a lawyer in the firm that represented National Home Products, Inc., which in 1989 was Unisource's majority shareholder. In 1990, Campbell bought the Wolfs' and his client's interests in Unisource. With the purchase, he became the sole shareholder and sole director of Unisource's wholly-owned subsidiary, the Amendt Corporation. Campbell made Amendt's controller, Jacqueline Noetzel, the corporation president. In exchange for Campbell's promise to pay them a purchase price of $1 million, the Wolfs agreed to cancel two judgments they had obtained against Unisource. Campbell paid the Wolfs half the purchase price at the closing and signed a promissory note for the remaining $500,000. The note required Campbell to make quarterly interest payments equal to nine percent of the remaining balance and annual principal payments of $50,000 in December of 1990 through 1993. Campbell's final payment of $300,000 plus remaining interest was due on December 31, 1994. In the event of a default, the interest rate would increase to eleven percent, and the Wolfs would have the right to accelerate the note. Amendt guaranteed the note, which was secured by mortgages on the company's real property and by security agreements that in effect made the Wolfs secondary lienholders on other property and equipment. The note required Amendt to provide the Wolfs with profit-and-loss balance sheets each calendar quarter and to furnish an audited profit-and-loss statement each year.
 
 
 4
 Amendt was never profitable after Campbell's acquisition and suffered substantial losses until 1993, when it filed for bankruptcy. Despite the company's financial difficulties, Campbell made the 1990 interest and principal payments as required. He also made all interest payments due in 1991, although his October interest payment was late. Campbell failed to make the $50,000 principal payment due at the end of the year, and the note has remained in default since then. Although the Wolfs had the right at this time to declare the note in default and demand immediate payment of the entire debt, they declined to do so. Instead, they made a number of demands for the amounts past due, and Campbell asked for several extensions. In February 1992, Campbell promised that he would pay the $50,000 in two equal installments on April 15 and May 15, 1992, but failed to do so. Campbell's subsequent attempts to borrow the funds he needed from other creditors also failed. In October 1992, Campbell suggested restructuring the entire debt. The Wolfs considered Campbell's proposal only after he paid the interest due in October 1992 and January 1993.
 
 
 5
 In March or April 1993, Campbell directed Noetzel to forward several earnings statements and balance sheets to the Wolfs' attorney to facilitate the restructuring of the debt. The company's inventory was substantially less than the $1,222,027 shown on the documents, which failed to reveal that between $100,000 and $200,000 of inventory was obsolete because the company had stopped selling certain products. The documents also failed to inform the Wolfs of an unexplained discrepancy between booked inventory and actual inventory amounting to at least $250,000. In addition, the asset figures included a $560,000 "Inter Co Receivable" known to be uncollectible. Campbell was aware that Amendt's assets were overstated in the materials he turned over to the Wolfs. Noetzel had informed Campbell as early as November 1992 that the company's inventory was overvalued and that certain items needed to be written off, but Campbell told her that he wanted to maintain overstated values so as not to worry creditors.
 
 
 6
 After reviewing the false documents furnished by Campbell and Amendt, Marvin Wolf and his lawyer met in April 1993 with Campbell to discuss restructuring the debt. After Campbell answered numerous questions about Amendt's financial situation to Wolf's satisfaction, the parties discussed new repayment terms. They discussed extending the repayment period by three years and keeping the interest rate at nine percent. Campbell provided a post-dated check for the interest payment due in April and agreed to make monthly, rather than quarterly, interest payments beginning in July 1993. The parties agreed that the restructuring would be contingent upon Campbell making the July interest payment. They did not reduce these terms to writing.
 
 
 7
 The Bankruptcy Court found that the parties entered into a bilateral contract for the extension of credit at the April 1993 meeting:
 
 
 8
 This Court finds that the parties had an agreement which was supported by consideration in the form of mutual promises: the Defendant agreed to pay the Plaintiffs in exchange for the Plaintiffs' agreement to accept monthly payments in place of annual principal payments and quarterly interest payments and to waive the default and not pursue legal remedies.
 
 
 9
 The District Court agreed with this finding of a bilateral agreement for refinancing.
 
 
 10
 Campbell failed to make the July interest payment, and the Wolfs filed a suit against Campbell and Amendt to collect the $391,000 still due on the note. The lawsuit was stayed following the bankruptcies of Amendt and Campbell. In the bankruptcy court, the Wolfs argued that the amount Campbell still owes them is nondischargeable under 11 U.S.C. § 523(a)(2)(B) because Campbell induced them to forbear from collection by furnishing false statements regarding the company's financial condition. The Bankruptcy Court found that Campbell had procured the forbearance by furnishing, with intent to defraud, a false statement in writing regarding Amendt's financial condition. The court nevertheless held the debt to be dischargeable under § 523(a)(2)(B) because the Wolfs failed to show that they lost a valuable collection remedy as a result of their forbearance in reliance on Campbell's false statements. The District Court reversed, holding that the "proximate cause," or "damages," requirement imposed by the bankruptcy court has no basis in the language of the statute.
 
 II.
 
 11
 Campbell contends that both the Bankruptcy Court and the District Court erred in concluding that the Wolfs' forbearance from collection constituted an "extension of credit" covered by § 523(a). We need not decide whether the act of forbearance alone induced by fraud, without an enforceable agreement to forbear, constitutes an "extension of credit" under § 523(a). The courts below found here a promise to forbear in exchange for new promises given by Campbell. Campbell contends that, as a matter of law, there was no binding agreement to forbear on the part of the Wolfs, but only an unenforceable agreement to agree on new repayment terms. We disagree. Even if the forbearance arrangement were not a bilateral contract, it would have been enforceable against the Wolfs under a theory of promissory estoppel. See State Bank of Standish v. Curry, 442 Mich. 76, 500 N.W.2d 104, 107-11 (Mich.1993); Restatement (Second) of Contracts, § 90 (1981). Such an enforceable promise clearly creates a sufficient "extension of credit" or "refinancing" to come within the coverage of § 523(a). The waiver of default and the agreement to forbear by the Wolfs in exchange for Campbell's modified promise to pay formed a deal sufficient to be called a new "extension of credit." The modified debt was obtained by fraud.
 
 
 12
 Campbell's second argument is more interesting. He says that the Wolfs are not entitled to relief under § 523(a)(2)(B) because his fraud caused them no additional injury beyond the original legitimate loan. The question, he says, is purely one of causation. Two phrases in the statute may be said to constitute causation requirements for nondischargeability of an "extension of credit." First, the debt is nondischargeable only "to the extent [it was] obtained by" the written false statement. Second, subsection (iii) requires the creditor to prove reasonable reliance on the false statement.
 
 
 13
 In this case, the Bankruptcy Court found that the Wolfs had reasonably relied on the false financial statements submitted by Campbell in agreeing to forbear from collection. The District Court accepted that finding, and Campbell does not challenge it on appeal. Instead, Campbell argues that the statutory phrase "to the extent obtained by" requires a creditor to demonstrate in a quantifiable manner that he was further injured because he lost a collection remedy or incurred some other detriment by forbearing. Campbell contends that the Wolfs cannot establish such injury since he was already insolvent when the Wolfs made the extension of credit. In other words, Campbell claims that the Wolfs lost nothing as a result of waiting to pursue collection because they would not have been able to collect from him anyway at the time they decided to forbear.
 
 
 14
 The Ninth Circuit seems to agree with this argument. It has construed the statute to require the creditor to establish damage through the loss of a valuable collection remedy. But several other circuits have declined to so hold, and we think they have the better side of the argument. Compare In re Siriani, 967 F.2d 302, 305 (9th Cir.1992), with Matter of McFarland, 84 F.3d 943, 947 (7th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 302, 136 L.Ed.2d 220 (1996); Matter of Norris, 70 F.3d 27, 29 n. 6 (5th Cir.1995); In re Goodrich, 999 F.2d 22, 25 (1st Cir.1993).
 
 
 15
 We reject Campbell's theory regarding the meaning of the phrase "to the extent obtained by." A contractual "refinancing" or "extension of credit" is sufficient without showing further damage. A creditor need not also show that he could have collected on the loan prior to the bankruptcy but for the new extension of credit. See the thorough discussion of this issue in Goodrich, 999 F.2d at 25-26. To be sure, the phrase "to the extent obtained by" only exempts from discharge the amounts actually extended as a result of the false statement, but in this case it is clear that this requirement has been satisfied. As a result of their reliance on the false financial statements Campbell provided, the Wolfs elected not to exercise their right to demand immediate repayment of the remaining $391,000 due on the note. Thus, the entire amount was "obtained by" Campbell's use, with intent to deceive, of a false statement in writing regarding the Amendt Corporation's financial condition, and the entire amount is nondischargeable under § 523(a)(2)(B).
 
 
 16
 To hold otherwise would create a perverse incentive for insolvent debtors to lie to creditors to get them to forbear collection of past due indebtedness and would remove the primary legal incentive for fair dealing namely, nondischargeability in bankruptcy when a contract is induced by fraud. A borrower's incentive to act with integrity should not end once he becomes insolvent. The bankruptcy law should encourage, not discourage, honesty among contracting parties, especially when there is temptation to lie because of the risk of default. We believe the nondischargeability provision is designed to establish such a set of incentives for borrowers, including borrowers who seek to roll over or refinance previous loans.
 
 
 17
 For the reasons stated, the judgment of the District Court is affirmed.
 
 CONCURRING IN PART, DISSENTING IN PART
 
 18
 KENNEDY, Circuit Judge, concurring in part and dissenting in part.
 
 The Bankruptcy Court found
 
 19
 that the parties did not enter an agreement constituting the "refinancing of credit" on April 13, 1996 because there was no agreement reached on terms of payment, including the interest rate, and both Plaintiff and his attorney acknowledge that any refinancing agreement would be contingent upon a July payment being made by the Defendant.
 
 
 20
 (J.A. at 7).
 
 
 21
 The bankruptcy judge then found that the plaintiffs' April 13, 1996 to July 1996 forbearance from collection efforts, after receipt of the March 29, 1993 financial statements, constituted an "extension of credit."
 
 
 22
 Instead, the Plaintiffs forbore from any collection efforts until at least July 1, 1993, leaving open the issue of whether the Plaintiffs' forbearance from any collection efforts, after their receipt of the March 29, 1993 financial statements, constituted an "extension of credit."
 
 
 23
 (J.A. at 7)
 
 
 24
 Later on in its opinion, the bankruptcy judge makes the finding that
 
 
 25
 the parties had an agreement which was supported by consideration in the form of mutual promises: the Defendant agreed to pay the Plaintiffs in exchange for the Plaintiffs' agreement to accept monthly payments in place of annual principal payments and quarterly interest payments and to waive the default and not pursue legal remedies.
 
 
 26
 J.A. at 11.
 
 
 27
 This holding appears to be in direct conflict with the earlier finding that the parties did not reach an agreement because there was "no agreement reached on terms of payment including the interest rate" and that any agreement was contingent on defendant paying the $50,000 July payment, a holding supported by the record.
 
 
 28
 The panel apparently concludes that there was an oral contract to forbear, or an oral contract of some kind, enforceable against the Wolfs under a theory of promissory estoppel. It is unclear whether it finds a separate contract dealing only with forbearance to July 1 or that plaintiffs would be estopped from accelerating the debt and required to restructure it in accordance with the discussions of April 13 if Campbell made the $50,000 interest payment due July 1. Collateral estoppel is available in Michigan, however, only where the terms of the promise are clear and definite. "[T]he sine qua non of the theory of promissory estoppel is that the promise be clear and definite ..." State Bank of Standish v. Curry, 442 Mich. 76, 500 N.W.2d 104, 107 (Mich.1993). Here, neither the interest rate nor the term of any extension of the loan had been agreed upon, only the concept of monthly payments was agreed to. In concluding that promissory estoppel could be found in Curry, the Michigan Supreme Court went on to say that while parties may
 
 
 29
 have left open some matters to be determined in the future, enforcement is not precluded if there exists a method of determining the terms of the contract either by examining the agreement itself or other usage or custom that is independent of a party's mere "wish, will and desire." An enforceable agreement may be found "even though the termination is left to one of the contracting parties [as long as] he is required to make it 'in good faith' in accordance with [an] existing standard or with facts capable of objective proof." 1 Corbin, Contracts, § 95, p. 402. The scope of an oral promise may also be identified by referring to the facts surrounding the loan where there exists a previous course of dealing between the parties, thereby supplying some objective method by which the missing terms could be supplied.
 
 
 30
 Id. at 110.
 
 
 31
 None of these methods is available here. The original loan was a three-year balloon loan. The defendant had suggested a five-year term and a fifteen-year amortization. Plaintiff had agreed only to monthly payments and some undefined extension. Nor is there any testimony about any separate agreement to forbear. At the April 13 meeting, plaintiffs accepted two post-dated checks totaling $50,000 (interest payment) which were honored and postponed reaching any final terms until Campbell paid the July 1st interest. The record is devoid of evidence that there was any agreement reached.
 
 
 32
 If I were able to agree with the panel that the parties agreed to new terms on the underlying debt, i.e., that there was a renewal of the underlying debt, then I agree with the panel that such a renewed debt is nondischargeable in its entirety. The debt sought to be collected in the bankruptcy proceeding would then be the renewed debt and would have been obtained by fraud. However, in the absence of an agreement restructuring or renewing the debt, we have only the original debt and any debt that may have been created by forbearance. The panel declines to decide whether forbearance alone, induced by fraud without an enforceable agreement to forbear, constitutes an "extension of credit" under § 523(a) since it apparently concluded that the courts below found here a promise to forbear in exchange for some new promises given by Campbell.
 
 
 33
 While I agree that forbearance can be an extension of credit, it seems to me that the only debt that results from forbearance which can be described as an extension of credit is the debt for interest for the period of forbearance. That debt, I agree, should not be discharged to the extent it was obtained by fraud. Here, however, the obligation to pay interest on July 1 was not modified in any way. There was no extension of credit given with respect to interest and the only debt is the underlying debt which was not obtained by fraud.
 
 
 34
 What other credit did Wolf extend? He did not extend the note, nor did he extend the time to pay the interest. Rather, the fraud induced Wolf to delay his collection efforts until July 1.
 
 
 35
 A number of bankruptcy courts have held that forbearance alone is not an extension of credit. See Howard & Sons, Inc. v. Schmidt (In re Schmidt ), 70 B.R. 634, 644 (Bankr.N.D.Ind.1986); Drinker, Biddle & Reath v. Bacher (In re Bacher ), 47 B.R. 825, 829 (Bankr.E.D.Pa.1985); Cement Nat'l Bank (In re Colasante ), 12 B.R. 635, 638 (E.D.Pa.1981).
 
 
 36
 There are also several bankruptcy court cases which are cited as being to the contrary. See In re Plechaty, 213 B.R. 119, 120 (1997); First Commercial Bank v. Robinson (In re Robinson ), 192 B.R. 569, 575-76 (Bankr.N.D.Ala., 1996); FDIC v. Cerar (In re Cerar ), 84 B.R. 524, 529 (Bankr.C.D.Ill.1988); First Bank v. Eaton (In re Eaton ), 41 B.R. 800, 803 (Bankr.E.D.Wis.1984) (all stating that delay of collection constitutes an extension of credit within the meaning of § 523(a)(2)).
 
 
 37
 A careful examination of those cases indicate that they do not involve mere forbearance but a renewal of credit. In First Commercial Bank v. Robinson, 192 B.R. 569 (Bankr.N.D.Ala.1996), the court found a renewal of credit.
 
 
 38
 Section 523(a)(2)(B) is explicit that a debt may be nondischargeable if it is, among other things, a renewal of an extension of credit. The August 6, 1992, transaction was a renewal of credit within the meaning of § 523(a)(2)(B).
 
 
 39
 Id. at 575. In FDIC v. Cerar, 84 B.R. 524 (Bankr.C.D.Ill.1988), a forged note was substituted for the original note. Credit was extended on the forged note. In First Bank v. Eaton, 41 B.R. 800 (Bankr.E.D.Wis.1984), the creditor was given the option of paying his demand note or providing additional security. The court found that acceptance of diamonds as additional security was an extension or enlargement of credit. The debt that could not be discharged, according to the bankruptcy court, was limited to the value of the diamonds. The extension of credit, then, was their value. It found, however, that the creditor's reliance on the debtor's ownership of the diamonds was not reasonable and so permitted discharge of the underlying debt.
 
 
 40
 John Deere Co. v. Gerlach, 897 F.2d 1048 (10th Cir.1990) also involved more than mere forbearance. Defendant was the father of the owner of a Deere franchise. His son would get persons to sign franchise contracts which would be submitted to Deere which would give the dealership credit for its outstanding indebtedness for the amount of the contract. The contract would later be canceled but the dealership would have the benefit of the credit in the interim. Defendant signed one of these contracts for his father. The court found this was an extension of credit and that the defendant was liable for the amount of the contract. It also found that Deere was damaged due to the fraud and that the father's fraud enabled the franchise to get credit for the ensuing month. If it had not had credit, it would have had to pay cash for parts and equipment delivered during the ensuing month. The father was unable to discharge the debt represented by the contract on which Deere had advance money and Deere's damages for extending credit for the next month. There was no issue in Gerlach as to whether there had been an extension of credit to the son's dealership by reason of the false contract. The dealership clearly received credit on its indebtedness to Deere in the amount of the fraudulent contract signed by defendant. The damages for the following month were awarded under Colorado law.
 
 
 41
 [I]t [bankruptcy court] also should treat new unsecured credit John Deere extended to the dealership in the month following submission of defendant's fraudulent contract as debt "obtained by" defendant's fraud.
 
 
 42
 Deere, 897 F.2d at 1052.
 
 
 43
 The instant case is also distinguishable from In re Goodrich, 999 F.2d 22 (1st Cir.1993) and Matter of McFarland, 84 F.3d 943 (7th Cir.1996) in that in each of those cases there was a refinancing of credit, something that did not occur here. Refinancing, to the extent induced by fraud, is explicitly listed as requiring denial of discharge.
 
 
 44
 Because I would hold that mere forbearance is not an extension of credit and can find neither restructuring of the debt nor renewal of the debt or refinancing of credit, I believe the original debt, which was not obtained by fraud, may be discharged.
 
 
 
 [1]
 The relevant portion of 11 U.S.C. § 523 reads in full as follows:
 (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt
 (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by
 ...
 (B) use of a statement in writing
 (i) that is materially false;
 (ii) respecting the debtor's or an insider's financial condition;
 (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
 (iv) that the debtor caused to be made or published with intent to deceive....