In re Jeffrey Allen **BENTON**, Debtor.

**Fahey Bank, Plaintiff,**

v.

**Jeffrey Allen Benton, Defendant.**

**Bankruptcy No. 04–55949.
Adversary No. 04–02674.**

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

Sept. 6, 2006.

Robert J. Morje, Columbus, OH, for Debtor/Defendant.

Erica A. Probst, Kemp, Schaeffer, Rowe & Lardiere Co., Columbus, OH, for Plaintiff.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

C. KATHRYN PRESTON, Bankruptcy Judge.

This cause came on for trial on December 20, 2005, in the above-captioned adversary proceeding. Present at the hearing were attorney Robert Morje representing Jeffrey Allen Benton ("Debtor"), and attorney Michael Schaeffer representing Fahey Bank (the "Bank"). Plaintiff's Complaint seeks a judgment of nondischargeability of debt pursuant to 11 U.S.C. § 523(a)(2)(B).

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the General Order of Reference entered in this District. This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(I).

### I. *Findings of Fact*

The Court having considered the evidence presented, finds and concludes as follows:

On March 15, 1996, the Debtor, age 25 at the time, and Jay Fisher entered into an agreement forming a partnership to be known as Iberia Woodworking. The purpose of the partnership was to manufacture and sell wood cabinets, furniture and other wood products. The agreement contemplated that the Debtor would devote

his time, skill, labor and experience full time to advance the interests of the business. On August 1, 1997, the parties dissolved their partnership.

Shortly thereafter, on September 11, 1997, Mr. Fisher agreed to and did lease certain property located at 3454 State Route 309, in Morrow County, Ohio, to the Debtor for the purpose of operating a new woodworking business known as Iberia Cabinet Manufacturing Company. The written Lease also granted to the Debtor an option to purchase the property at the end of 20 years at a fair market value to be determined by appraisals. The Lease provided for payment of rent by the Debtor to Mr. Fisher of $2000 per month, adjustable annually. At that time, Mr. Fisher was the sole owner of the property, having acquired the property by warranty deed in June 1996.

Although unclear exactly when, during the term of the Lease, Mr. Fisher worked with the Debtor in attempts to purchase the building, talking with a number of financial institutions. However, the purchase by Debtor never came to fruition and the Debtor continued to pay rent to Mr. Fisher.

In 1997, the Debtor approached Fahey Bank for a loan. Pursuant to Fahey Bank's loan application process, the Debtor presented a personal financial statement dated January 1, 1998, which reflected that the Debtor had a net worth of $318,000. Among other things typical of a personal financial statement, the Debtor reflected that he owned business real estate located at 3454 State Route 309, having a value of $350,000. The Debtor signed the personal financial statement in February 1998. Carl Hughes, CEO and President of the Bank, personally discussed the financial statement with the Debtor, reviewing each item thereon and specifically discussing the real estate, which comprised the bulk of Debtor's net worth. Mr. Hughes also contacted personal references who provided Mr. Hughes with the highest recommendations he had ever heard.

Although the real estate was the sole significant asset on the Debtor's personal financial statement, the Bank did not confirm the Debtor's ownership of the real estate or the value of the real estate. The Bank did not verify the accounts receivable, life insurance, or liquid assets reflected on the personal financial statement. However, the Debtor on several occasions specifically stated that he owned the subject real estate and Mr. Hughes toured the facility prior to making the loan. Upon inquiry, the Debtor stated that his business had done well and that he had put all of his money into the real estate. There is no indication that the Bank requested tax returns or other documentation to confirm the performance of the business or the Debtor's net income.

On February 14, 1998, Fahey Bank granted a loan to the Debtor in the amount of $50,097.00, in the form of a line of credit under which advances were available upon customer request with loan officer approval. The loan was payable on demand. The Debtor also granted to the Bank a security interest in all equipment and business assets owned by the Debtor. On June 22, 1998, the Debtor executed a new note in the amount of $58,005.67. The new note required 66 monthly installment payments and had a maturity date of December 22, 2003.[1] In connection with this loan, the Debtor granted a security interest in all business assets and equipment, as well as a 1998 Ford F250 Pickup Truck.

---

1. Testimony of Mr. Hughes indicated that the June 1998 note was a renewal of a March 1998 loan; however, the March 1998 loan documentation was not presented to the Court.

On March 31, 2000, the Debtor once again borrowed funds from Fahey Bank and executed a promissory note in the amount of $55,172.00, which note called for full payment on July 1, 2000. By this time, it appears that the Debtor had established a business entity of some kind, and the entity known as "Iberia Cabinet Mfg Co" signed the note as a co-borrower with the Debtor. Despite the appearance of a new entity on the scene, and the passage of two years since the financial statement was submitted to the Bank, Fahey Bank did not request an update or a new personal financial statement from the Debtor at the time of extending this third loan. This third loan was approved by another loan officer of the Bank and Mr. Hughes testified that the Bank would not have made the 2000 loan if the Debtor had not already had a relationship with the Bank.

On October 20, 2000, the Bank consolidated the three outstanding loans, and the Debtor executed a single promissory note in the amount of $145,930.69 providing for payment in 60 monthly installments. The indebtedness remained secured by the business assets and the Ford Pickup Truck. On this occasion, the note was co-signed by a business entity by the name of "Conestoga Cabinet Company aka Iberia Cabinet Manuf. Co." Again, no update to the financial statement or new financial statement was requested by Fahey Bank.

The Debtor was evidently unable to comply with the terms of the October 2000 note, and in April 2001, Fahey Bank obtained a Judgment Entry against the Debtor and the business entity in the amount of $141,487.04 consisting of principal balance of $138,672.39 plus interest of $2,814.65. As of the time of trial in this matter, the Bank was owed in excess of $187,000.

## II. *Conclusions of Law*

11 U.S.C. § 523(a)(2)(B) provides in pertinent part as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing-(i) that is materially false;

(ii)respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive . . . .

Each of the five elements listed in § 523(a)(2)(B) must be satisfied for the Court to make a finding of nondischargeability of debt.

The Plaintiff bears the burden of proof when pursuing an exception to discharge against the Debtor. *Abroms v. Kern (In re Kern)*, 289 B.R. 633, 637 (Bankr.S.D.Ohio 2003). The standard of proof for establishing an exception to discharge pursuant to 11 U.S.C. § 523(a) is "the ordinary preponderance-of-the-evidence standard." *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Further, exceptions to discharge are to be strictly construed against the party seeking the same. *Rembert v. AT & T Universal Card Servs. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir.1998) (citation omitted).

The Debtor concedes that he used a written statement that was materially false respecting his financial condition. However, the Debtor disputes that he intended to deceive Fahey Bank and that the Bank

reasonably relied on the financial statement.

## A. *Intent*

 Few will openly admit to deceitful intent; therefore, all of the facts, including circumstantial evidence, may be relied upon by the court to make its findings. *Hoffman & Kuhn, Inc. v. Branham (In re Branham)*, 126 B.R. 283, 290 (Bankr. S.D.Ohio 1991), citing *Devers v. Bank of Sheridan, Montana (In re Devers)*, 759 F.2d 751, 754 (9th Cir.1985) (other citations omitted).

 In the instant case, the Court can draw no conclusion but that the Debtor intended to deceive the Bank. The Debtor, who did not appear to testify in the trial, makes much of the fact that he has only a high school education, and was only age 27 at the time, suggesting that he lacked sophistication in business affairs. However, there is no evidence that he was unable to read and understand documents. The Lease, written in plain English, is quite simply a lease of the real estate; at no place does it purport to transfer ownership of the real estate. Indeed, it plainly states that the payments to be remitted by the Debtor are payable to the "Lessor" and constitute rent. The concept of an option is often times confusing to lay persons; however, the option granted by the Lease allows the Debtor to purchase the property, not then or within a short period of time, but "at the end of twenty (20) years at fair market value...." (Lease, p. 10). Furthermore, the Debtor met with other financial institutions in an effort to purchase the property; thus, he knew that he did not yet own it.

Notwithstanding this, the Debtor represented in the financial statement, confirmed by express verbal statements, that he owned the real estate, and owned it free and clear of any encumbrances. At the same time, he represented that he had no rent or other monetary obligations with respect to the real estate, despite the fact that he was paying rent to Mr. Fisher. The Court is satisfied that he knew that the representations were false and intended the Bank to rely on them.

## B. *Reasonable Reliance*

The Bank may not necessarily have an affirmative duty to investigate or verify ownership of assets claimed on a loan application. "[I]t is reasonable for a creditor to assume that the financial statement [presented by a potential borrower] is accurate when it is complete and contains no apparent inconsistencies." *Branham*, 126 B.R. at 291 There is no statutory duty on the part of creditors to make such an investigation. The question is whether it is the creditor's customary practice to do so and whether there is such a custom or practice in the industry. *Harbor Federal Savings & Loan Ass'n. v. DiMarco (In re DiMarco)*, 105 B.R. 128 (Bankr.S.D.Fla. 1989).

 The creditor must have actually and reasonably relied on the false financial statement in making its credit decision. However, the bank does not have to demonstrate that the financial statement was the only factor influencing its credit decision. Partial reliance on the financial statement is sufficient. *Northern Trust Co. v. Garman (In re Garman)*, 643 F.2d 1252, 1253 n. 1 (7th Cir.1980), citing *Cunningham v. Elco Distributors*, 189 F.2d 87 (6th Cir.1951); *First Commercial Bank v. Robinson (In re Robinson)*, 192 B.R. 569, 576 (Bankr.N.D.Ala.1996), citing *Central National Bank & Trust Co. v. Liming (In re Liming)*, 797 F.2d 895, 898 (10th Cir. 1986) (other citations omitted).

 On the other hand, reliance must be reasonable. Several factors need to be ascertained to evaluate whether a creditor's reliance was reasonable. As

stated by the Sixth Circuit Court of Appeals:

Whether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances. Among the circumstances that might affect the reasonableness of a creditor's reliance are: (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*BancBoston Mortgage Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1560 (6th Cir.1992). The Sixth Circuit emphasized that the reliance test is not particularly rigorous; however, that Court also cautioned that dischargeability cannot be denied where the creditor's reliance is so unreasonable as to negate any actual reliance. *Id.* Also relevant are other circumstances at the time of the transaction, the creditor's standard business practices, and the standards and customs of the industry. *In re Robinson*, 192 B.R. at 577.

■ The Court has no doubt that the Bank relied on the financial statement to some extent, in light of the effort to review the financial statement with the Debtor in detail and the visit to the premises. Although the Bank did not verify from other sources any of the content of the financial statement, according to the testimony of Mr. Hughes, this was consistent with the Bank's normal practice when considering a loan request. However, the Court cannot say that the reliance was reasonable. At the time of the first loan, neither the loan officer nor the Bank had had a close personal or previous business relationship with the Debtor. At the time of the second loan, the relationship was only six months old. Therefore, no relationship of trust could have yet developed. The loans were acquired for commercial purposes but the Debtor is by all accounts, unsophisticated in business dealings.

Moreover, there were "red flags" in the financial statement that should have indicated that additional investigation was warranted: the Debtor was a 27 year old cabinet maker who had been in business for himself only seven or eight years, yet he purportedly owned improved real estate of significant value ($320,000), **free and clear of any encumbrances.** Even Mr. Hughes testified that he was quite impressed that such a young man could own such an asset. Second, the financial statement reflected federal and state income tax liabilities of over $12,000 but the list of annual expenses reflected income taxes of only $3800. Additionally, the Debtor failed to list on the financial statement the very assets in which he gave the Bank a security interest. Finally, without the real estate, the Debtor had a negative net worth. Mr. Hughes testified that the real estate constituted a very important factor in the Bank's evaluation, and that the Bank wouldn't have made a loan to a borrower with a negative net worth.

These combined factors signal that the financial statement lacked accuracy, or at least that there existed anomalies in the Debtor's financial condition that warranted explanation. In short, the flags should have evoked additional minimal investigation by the Bank. Such a minimal investigation could have taken various forms, three of which readily spring to mind and would require little effort: (1) verifying the ownership of the real estate, (2) ob-

taining copies of recent financial statements or other financial information for the business (since no significant financial information for the business, a sole proprietorship, was included in the personal financial statement submitted to the Bank by the Debtor), or (3) perhaps more telling and perhaps more customary in the industry, obtaining copies of the Debtor's recent income tax returns, which would have verified (or not) the Debtor's wherewithal to have acquired the real estate, as well as the ownership of the real estate and the Debtor's net income.[2] Even though excellent references can lend credibility to the financial statement and the Debtor's creditworthiness, they cannot overcome anomalies or unusual entries on the financial statement that should signal to the creditor to stop and proceed only after more due diligence. *See, e.g., Leadership Bank, N.A. v. Watson (In re Watson),* 958 F.2d 977 (10th Cir.1992).

 At the time of the third loan, in addition to the factors discussed above, the financial statement was two years old, obviously stale. The court in *Robinson* faced a similar situation: in *Robinson,* the lender allegedly relied on a financial statement that was 20 months old. The *Robinson* court held that the debtor's verbal reaffirmation to the lender that his financial condition had not changed since the date of the earlier financial statement brought the aged financial statement current, curing any staleness, and therefore, the lender's reliance was reasonable. *Robinson,* 192 B.R. at 577, citing *Martin v. Bank of Germantown (In re Martin),* 761 F.2d 1163 (6th Cir.1985). In the instant case, the record is devoid of any evidence that the Bank obtained any confirmation, writ-

ten or verbal, of the continued accuracy of the financial statement. It is patently unreasonable for the Bank to have relied on a two year old financial statement without some verification of the Debtor's current financial condition.

Under the totality of the circumstances in the instant case, the Court cannot find that the Bank's reliance on the financial statement was reasonable.

### III. *Conclusion*

The Plaintiff having failed to satisfy all of the elements of a cause of action under Section 523(a)(2)(B), the Court must enter judgment in favor of the Debtor and dismiss the Plaintiff's Complaint. A separate final judgment shall be entered in accordance with the foregoing.

---

**2.** Note that the Court is not suggesting that, as a matter of course, a lending institution should verify ownership of assets listed on a financial statement. Further investigation (over and above the lenders customary procedures, and industry standards) is only required when "red flags" indicate that such is warranted prior to making a credit decision, and verification of ownership is but one option in such circumstances.