IN RE: Peter Dominic ANZO, Debtor.

Dallas A. Hurston, Plaintiff,

v.

Peter Dominic Anzo, Defendant.

Case No.: 14–22766–JRS
Adversary Proceeding Case
No.: 15–2026–JRS

United States Bankruptcy Court,
N.D. Georgia, Gainesville Division.

Signed March 25, 2016

Derek J. Krebs, Melissa J. Perignat, Holt Ney Zatcoff & Wasserman, LLP, Atlanta, GA, for Plaintiff.

Charles N. Kelley, Jr., Kelley & Clements LLP, Gainesville, GA, Scott B. Riddle, Law Office of Scott B. Riddle, LLC, Atlanta, GA, for Defendant.

## ORDER

James R. Sacca, U.S. Bankruptcy Court Judge

This dispute stems from the purchase of a marina located on Lake Burton in North Georgia, and a subsequent loan from the Plaintiff to the purchasing entity owned in part by the Debtor. After a prior extension, when the Debtor's entity could still not repay the loan at its maturity date, the Debtor guaranteed the loan in connection with a further extension and provided an allegedly false written statement regarding his financial condition. After one final extension, which the Plaintiff alleges was obtained by the previously provided written financial statement, the loan was not paid back at its maturity, and the Plaintiff obtained a judgment against the Debtor on account of his guaranty. Subsequently, the Debtor filed for chapter 7 bankruptcy relief, to which the Plaintiff responded by

filing this dischargeability action under § 523(a)(2)(B), pointing to the false financial statement. The parties have now filed cross-motions for summary judgment which are presently before the Court. (Docs. 45 & 48).

## Facts

Peter Anzo ("Mr. Anzo") formed La-Prade's Marina, LLC ("LaPrade's"),[1] which purchased LaPrade's Marina located on Lake Burton (the "Marina") in March 2006. (Pl.'s Statement of Material Facts Not in Dispute ("Pl.'s SOMF") ¶¶ 1–2; Def.'s Response to Pl.'s Statement of Material Facts Not in Dispute ("Def.'s Resp.") ¶¶ 1–2; Def.'s Statement of Material Facts Not in Dispute ("Def.'s SOMF") ¶ 8; Pl.'s Response to Def.'s Statement of Material Facts Not in Dispute ("Pl.'s Resp.") ¶ 8). Mr. Anzo was the majority owner and manager of LaPrade's and had previous experience with marinas. (Pl.'s SOMF ¶ 3; Def.'s Resp. ¶ 3). Dallas Hurston ("Mr. Hurston") had been a longtime patron of the Marina, and was an investor in the entity that owned the Marina prior to La-Prade's.[2] (Pl.'s SOMF ¶ 4; Def.'s Resp. ¶ 4; Def.'s SOMF ¶ 2; Pl.'s Resp. ¶ 2). Prior to his retirement in 2000, Mr. Hurston worked for a multi-national corporation for thirty three years, the majority of which time he spent in the Corporate Tax Department, and for his last six years he was the Director of Corporate Real Estate. (Def.'s SOMF Dallas ¶ 4; Pl.'s Resp. ¶ 4).

*October 2007 Note*

When the Marina was purchased by La-Prade's, Mr. Hurston expressed interest in obtaining an equity interest, but did not obtain such an interest. (Pl.'s SOMF ¶ 6; Def.'s Resp. ¶ 6). Instead, Mr. Hurston loaned LaPrade's $400,000, evidenced by a promissory note dated October 25, 2007 (the "October 2007 Note"). (Pl.'s SOMF 6, 9; Def's Resp. 6, 9). Mr. Anzo did not provide a guaranty or a financial statement in connection with the October 2007 Note. (Def.'s SOMF ¶ 11; Pl.'s Resp. ¶ 11). The October 2007 Note's maturity date was October 25, 2008. (Pl.'s SOMF ¶ 9; Def.'s Resp. ¶ 9).

Prior to that maturity date, Mr. Hurston and Mr. Anzo discussed a potential extension or renewal because of LaPrade's inability to pay back that note at that time.[3] (Pl.'s SOMF ¶ 10; Def.'s Resp. ¶ 10; Def.'s SOMF ¶ 13; Pl.'s Resp. ¶ 13). LaPrade's was negotiating with one or more banks to refinance the debt it owed to its lenders, including Mr. Hurston. Other lenders of LaPrade's at this time included Omni National Bank, the first priority secured creditor on the Marina, and the HHE Partnership, LP, the prior owner who had purchase money debt secured by a junior position on the Marina. These negotiations, which are referenced in the E-mails described below, were taking place in late 2008 at a time when many commentators were contending that the country's financial markets were on the verge of collapsing and the availability of commercial real

---

1. LaPrade's filed for Chapter 11 bankruptcy relief in this Court in 2015, case No. 15–20697. The Court has utilized non-controversial facts from that case known to it from documents filed of record in this statement of facts to offer a more complete and accurate picture even if those facts are not necessarily relevant to the motions pending before the Court in this proceeding, such as when the marina was acquired.

2. When LaPrade's purchased the Marina, Mr. Hurston received repayment of the entirety of his investment in the prior entity. (Def.'s SOMF ¶ 9; Pl.'s Resp. ¶ 9).

3. Mr. Hurston asserts that he was hesitant to give an extension and communicated his concerns, although Mr. Anzo contends that Mr. Hurston exhibited little or no hesitancy in extending the October 2007 Note. (Pl.'s SOMF ¶ 12; Def.'s Resp. ¶ 12).

estate loans was extremely limited if not almost non-existent. North Georgia, where this Marina is located, was particularly hard hit and that area was among the nation's leaders in bank failures during this time.[4] Debtors often tend to be optimistic about the values of their assets and enterprises, but the thought that LaPrade's was going to be able to refinance its debt at this time and in that financial climate proved to be naïve.

In connection with the discussions regarding an extension, the parties began discussing the possibility of Mr. Anzo providing a guaranty. They dispute whether Mr. Hurston initially requested a guaranty or whether Mr. Anzo first offered to provide a guaranty. (Pl.'s SOMF ¶ 13; Def.'s Resp. ¶ 13; Def's SOMF ¶ 14; Def's Resp. ¶ 14). In any event, during these discussions, the parties exchanged e-mails on or around October 10, 2008 regarding Mr. Anzo's assets (the "E-mails"). In the E-mails Mr. Hurston inquired as to the ownership of Mr. Anzo's real estate in order to determine whether a waiver of Mr. Anzo's homestead exemption would have any effect. Mr. Anzo informed Mr. Hurston that his wife owned a lake house (the "Lake House") and he and his wife jointly owned a condominium (the "Condo"). In addition, Mr. Anzo stated that the bulk of his net worth, allegedly in excess of $10,000,000, was not in his personal residences.

### October 2008 Note

Eventually, Mr. Hurston and LaPrade's agreed to an extension, evidenced by a note dated October 29, 2008 in the principal amount of $432,000, and with a maturity date of January 27, 2009 (the "October 2008 Note"). (Pl.'s SOMF ¶ 17; Def.'s Resp. ¶ 17). Mr. Anzo signed the October 2008 Note on behalf of LaPrade's and as a guarantor in consideration for this mere 90 day extension. (Def.'s SOMF ¶¶ 22–23; Pl.'s resp. ¶¶ 22–23). This extension was provided after the E-mails, but without a formal financial statement. During this time, LaPrade's continued to try to refinance its debt while the country's recession deepened.

Prior to the January 2009 maturity date of the October 2008 Note, Mr. Hurston sent a letter to LaPrade's informing it that he expected full payment upon the October 2008 Note's maturity date. (Pl.'s SOMF ¶ 19; Def.'s Resp. ¶ 19). In a letter dated January 21, 2009, Mr. Anzo explained to Mr. Hurston that despite his attempts to refinance, it was unlikely LaPrade's would be able to pay off the October 2008 Note on its maturity date. (Pl.'s SOMF ¶ 20; Def.'s Resp. ¶ 20; Def.'s SOMF ¶ 25; Pl.'s Resp. ¶ 25). Along with that letter, Mr. Anzo provided a document entitled "Personal Net Worth Statement of Peter D. Anzo" (the "Financial Statement") dated as of January 1, 2009. The Financial Statement was prepared by Mr. Anzo. (Pl.'s SOMF 24–25; Def.'s Resp. ¶ 24–25).

### January 2009 Note

Thereafter, the parties agreed to another extension, evidenced by a note dated January 28, 2009 in the principal amount of $444,782, with a maturity date of April 28, 2009 (the "January 2009 Note"). (Pl.'s SOMF ¶ 42; Def.'s Resp. ¶ 42). Mr. Anzo again signed the note as guarantor. (Def.'s SOMF ¶ 27; Pl.'s Resp. ¶ 27). In the interim, LaPrade's principal secured lender, Omni National Bank, failed in March 2009. The January 2009 Note was not paid off on its maturity date. (Pl.'s SOMF ¶ 44; Def.'s Resp. ¶ 44). On May 23, 2009, Mr. Hurston sent a letter to Mr. Anzo and LaPrade's declaring a default of the January 2009 Note and demanding

---

4. Omni National Bank failed in March 2009.

payment or he would pursue other collection remedies (the "May Default Letter").[5] (Pl.'s SOMF ¶ 45; Def.'s Resp. ¶ 45). Mr. Hurston asserts that in May 2009 he hired counsel and was preparing to commence litigation against LaPrade's and Mr. Anzo to recover the amounts owed in the January 2009 Note. (Pl.'s SOMF ¶ 46).

### June 2009 Note

However, after the May Default Letter, the parties discussed an extension of the January 2009 Note, and eventually, in June 2009, they agreed to another extension, effective as of April 29, 2009, evidenced by a note in the principal amount of $461,233, with a maturity date of October 28, 2009 (the "June 2009 Note").[6] (Def.'s SOMF ¶¶ 31–32, 34; Pl.'s Resp. 31–32, 34). In connection with the June 2009 Note, Mr. Anzo signed a separate guaranty agreement which was also effective as of April 29, 2009 (the "Guaranty Agreement"). (Def.'s SOMF ¶ 35; Def.'s Resp. ¶ 35). Mr. Hurston alleges that he relied heavily on the Financial Statement in May and June 2009 when deciding whether to extend the January 2009 Note, and if he had known that Mr. Anzo's net worth was less than what was represented he would have filed suit immediately. (Pl.'s SOMF ¶¶ 51–58; Hurston Aff. ¶ 50). He contends that he had no reason to suspect Mr. Anzo's financial condition changed in any material way since receiving the Financial Statement, and that Mr. Anzo continued to maintain a wealthy lifestyle. (Id.). Mr. Anzo asserts that Mr. Hurston did not request a financial statement from him prior to the execution of the June 2009 Note nor did he ask for an updated version of the Financial Statement. (Anzo Aff. ¶ 27). In addition, Mr. Anzo alleges that he never provided a financial statement in connection with the June 2009 Note, that Mr. Hurston did not actually rely on the Financial Statement as he never asked a single question about it or anything contained in it, and if he did rely on the Financial Statement in June 2009, that reliance was not reasonable because he knew information contained in the Financial Statement was inaccurate from the E-mails and it was stale. (Def.'s SOMF ¶¶ 36, 39–41).

By its maturity date, the June 2009 Note was not paid in full. After demand for payment, Mr. Hurston filed suit in the State Court of Cobb County against LaPrade's and Mr. Anzo. (Pl.'s SOMF ¶¶ 61–63; Def.'s Resp. ¶¶ 61–63). He received a judgment against LaPrade's and Mr. Anzo, jointly and severally, in the amount of $626,825.48, and perfected the judgment. (Pl.'s SOMF ¶ 64; Def.'s Resp. ¶ 64).

### The Financial Statement

The Anzo Financial Statement was prepared by Mr. Anzo, and had a list of what was purported to be Mr. Anzo's assets and liabilities as of January 1, 2009. According to the Financial Statement, Mr. Anzo's assets totaled $15,290,433, made up of: (a) $119,000 of cash on hand and in financial institutions; (b) $5,622,178 worth of stocks and bonds, most of which were interests in privately held companies;[7] (c) $72,500 cash

---

5. In the May Default Letter, Mr. Hurston referred to the assets in the Anzo Financial Statement.

6. The June 2009 Note was signed in June 2009 "as of" April 29, 2009 to coincide with the maturity date of the January 2009 Note. (Def.'s SOMF ¶ 33; Pl.'s Resp. ¶ 33).

7. The stocks and bonds included: (a) 85% interest in The Vinings Group I, LLC estimated to be worth $755,075; (b) 2,000 shares in ANTS, Inc. worth $210,000; (c) 42.5% interest in Vinings Marine Group, LLC worth $412,500; (d) 486 shares in Vinings Investment Properties Trust worth $3,888,000; (e) Miscellaneous Blue Chips worth $271,603;

value of life insurance;[8] (d) real estate worth $4,330,000;[9] (e) $4,603,825 in partnership interests;[10] (f) $255,000 in notes receivable; (g) vehicles worth $58,000;[11] and (h) miscellaneous personal property worth $229,930. It indicated his total liabilities as of January 1, 2009 were $2,785,319. The Financial Statement estimated Mr. Azno's total net worth as of January 1, 2009 to be $12,505,114. It states, "[t]his statement is given for the purpose of obtaining credit and constitutes the true and correct state of my financial conditions" and is signed by Mr. Anzo. The financial statement does not mention Mr. Anzo's wife nor was it signed by his wife. Mr. Anzo did not obtain appraisals in conjunction with preparing the Financial Statement. (Pl.'s SOMF ¶ 70; Def.'s Resp. ¶ 70).

As it turns out, the Financial Statement contained numerous inaccuracies. About fifty percent of the assets listed in the Financial Statement were not Mr. Anzo's assets in January 2009, but rather those of his wife. (Pl.'s SOMF 67–68; Def.'s Resp. ¶¶ 67–68). In particular, Mr. Anzo did not have an interest in: (a) $229,930 worth of personal property; (b) $271,603 worth of

miscellaneous blue chips; (c) $200,000 interest in Little Creek Investment Group; (d) $175,000 interest in Little River Investment Group; (e) $55,000 interest in Willoughby Investment Group; (f) $450,000 in Lake Perry Marina, LLC; (g) $90,000 interest in Shallow Anchor Marina; (h) $123,500 interest in VMG Investment Group, L.P.; (i) $246,325 interest in VMG DSOO, LLC; (j) $241,500 interest in VMG GC, LLC; (k) $59,000 interest in Family Partnerships; (1) $2,100,000 interest in the Lake House; and (m) $1,130,000 interest in the Condo. (Pl.'s SOMF ¶ 69; Def.'s Resp. ¶ 69). He also only had a partial interest in other assets included in the Financial Statement. (Pl.'s SOMF ¶¶ 70–71; Def.'s Resp. ¶¶ 70–71). In addition, the Financial Statement omitted almost $10 million worth of contingent liabilities from personal guaranties. (Pl.'s SOMF ¶ 67; Def.'s Resp. ¶ 67).

Mr. Anzo admits that the Financial Statement was "hastily prepared and contained some inaccuracies." His explanation for this is that he used an old form on his computer from a prior attempt to obtain financing, which included his wife's

and (f) 8500 shares in Daufuskie Ferry Co. worth $85,000.

8. The life insurance policies with a cash value included: (a) a policy with State Farm with a cash value of $8,000; (b) a policy with Shenandoah Life with a cash value of $44,639; and (c) a policy with Protective Life with a cash value of $60,611.

9. The real estate included: (a) a single family rental property located at 5404 Vernon Walk, Atlanta, Georgia 30327 (the "Vernon Walk Property"); (b) the Condo, located in Atlanta; and (c) the Lake House, which was his personal residence located in Clayton, Georgia.

10. According to the Anzo Financial Statement, his partnership interests included: (a) a 15% interest in Little Creek Investment Group worth $200,000; (b) a 4.5% interest in Little

River Investment Group worth $175,000; (c) an 11% interest in Willoughby Investment Group worth $55,000; (d) a 40% interest in Lake Perry Marina, LLC worth $450,000; a 7.50% interest in Shallow Anchor Marina worth $90,000; (e) a 50% interest in Toledo Beach Marina, L.P. worth $140,000; (f) a 50% interest in VMG Investment Group L.P. worth $123,500; (g) a 50% interest in VMG D500, LLC worth $246,325; (h) a 50% interest in VMG GC, LLC worth $241,500; (i) a 50% interest in Point Lookout Investment Group, LP worth $123,500; (j) a 5% interest in Family Partnerships worth $59,000; and (k) a 67.5% interest in LaPrade's Marina LLC worth $2,700,000.

11. The three vehicles were (a) a 2003 Lexus LS 430 worth $22,000; (b) a 2006 Honda Ridgeline worth $21,000; and (c) a 2003 Audi A–4 convertible worth $15,000.

assets. (Anzo Aff ¶ 34). He asserts that while he should have given the Financial Statement more attention when preparing it, he never intended to deceive Mr. Hurston. (Anzo Aff. ¶ 36). In addition, he contends that Mr. Hurston never requested any personal tax returns, property deeds, bank account or investment account records, loan documents, credit reports, or any other financial information or documents about his personal finances. (Anzo Aff. ¶ 30). Nor did Mr. Hurston, he alleges, ask for any documents or information regarding the private entities included as assets in the Financial Statement. (Anzo Aff. ¶ 39). In fact, Mr. Anzo asserts that Mr. Hurston never even indicated to Mr. Anzo that he read or reviewed the Financial Statement until after commencing litigation. (Anzo Aff. ¶ 31). According to Mr. Anzo, Mr. Hurston never indicated he was relying on the Financial Statement when he agreed to the June 2009 Note and did not request a financial statement in connection with the June 2009 Note. (Anzo Aff. ¶ 43).

Mr. Hurston, on the other hand, asserts that he reviewed the Financial Statement very carefully, and relied heavily on it when agreeing to the June 2009 Note. (Hurston Aff. 47–50). He contends that he put Mr. Anzo on notice that he was relying on the Financial Statement in his May Default Letter which states, "[s]hould payment not be received on or before ten (10) days from the date of this letter, I intend to pursue the collection alternatives ... in order to perfect your personal guarantee against the assets included in [the Financial Statement]" (*Id.*). Further, he alleges that he did not have the ability to verify the values of, and Mr. Anzo's ownership in, the various stocks, bonds, partnerships and companies represented in the Financial Statement, but was not concerned because of Mr. Anzo's reputation,

prior representations, and lavish lifestyle. (Hurston Aff. 32–36).

*Mr. Anzo's Bankruptcy*

On November 25, 2014, Mr. Anzo filed for chapter 7 bankruptcy relief. Mr. Hurston filed a secured claim for $936,319.55. He also filed the present adversary proceeding on March 4, 2015 seeking to have his debt declared non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B) and recover attorneys' fees and expenses. After discovery, the parties filed cross-motions for summary judgment which are now before the Court.

**Summary Judgment Standard**

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *Id.* The Court "should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his favor." *United States v. Four Parcels of Real Prop.,* 941 F.2d 1428, 1437 (11th Cir.1991) (citations and punctuation omitted). The court may not weigh conflicting evidence or make credibility determinations. *Hairston v. Gainesville Sun Publ'g. Co.,* 9 F.3d 913, 919 (11th Cir.1993), *reh'g denied,* 16 F.3d 1233 (1994) (en banc).

For issues upon which the moving party bears the burden of proof at trial, he must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of his claim on that legal issue. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). He must support his motion with credible evidence that would

entitle him to a directed verdict if not controverted at trial. *Id.* If the moving party makes such a showing, he is entitled to summary judgment unless the non-moving party comes forward with significant, probative evidence demonstrating the existence of an issue of material fact. *Id.*

## Discussion

### A. Statute of Limitations

■ The Court will first address the threshold matter of whether, as Mr. Anzo argues, Mr. Hurston's claim pursuant to § 523(a)(2)(B) is barred by the Georgia statute of limitations for fraud. Specifically, Mr. Anzo argues that because claims under § 523(a)(2)(B) are "essentially grounded in state-law claims for fraud" they are subject to the four year Georgia statute of limitations for fraud which expired prior to the filing of Mr. Anzo's chapter 7 bankruptcy case.

■ Determining whether a debt is non-dischargeable is a two-step process. First, a claim must be established under state or non-bankruptcy federal law. *In re Smith,* 495 B.R. 291, 297 (Bankr. N.D.Miss.2013); *In re Banks,* 225 B.R. 738, 744 (Bankr.C.D.Cal.1998). If a debt is established, then the court gets to the issue of whether it is non-dischargeable. *Id.* State statutes of limitations are relevant to the first issue, the establishment of a debt. For instance, if a suit is not brought within the time period allotted under state law, the debt cannot be established because it is barred by the statute of limitations. *Id.* However, the question of whether a debt is dischargeable in bankruptcy is a distinct issue governed by the time limits established in the Bankruptcy Code. *Id.*

In *In re McKendry,* the Tenth Circuit examined the issue of whether, after a debt is reduced to judgment in state court, a bankruptcy court is "barred by a state statute of limitations from considering the underlying nature of the debt in determining whether that debt is dischargeable." 40 F.3d 331, 334 (10th Cir. 1994). In *McKendry,* the creditor foreclosed on property and obtained a deficiency judgment against the debtor. *Id.* at 333. After the debtor filed for chapter 7 bankruptcy relief, the creditor filed a dischargeability action pursuant to § 523(a)(2) which the debtor argued was barred by the state statute of limitations for fraud. *Id.* The Tenth Circuit concluded that because the creditor previously obtained a deficiency judgment the debt was established and the state statute of limitations was no longer relevant. *Id.* at 337. Instead, only the sixty day period provided by bankruptcy law was applicable. *Id.*; *see also In re May,* No. 04–9177, 2006 WL 5940803, at *4 (Bankr. N.D.Ga. Sept. 29, 2006).

In this case, Mr. Hurston brought suit and obtained a judgment against Mr. Anzo in state court prior to the filing of the chapter 7 bankruptcy case. The debt against Mr. Anzo has been established and the state statute of limitations for fraud is no longer relevant. The fact that Mr. Hurston obtained a judgment against Mr. Anzo based on breach of contract as opposed to fraud does not bar him from now attempting to have that debt declared non-dischargeable pursuant to § 523(a)(2)(B). As mentioned in the Court's prior order denying Mr. Anzo's motion to dismiss, there are several reasons why a party may decide to obtain a judgment for breach of contract as opposed to fraud, including efficiency and economical purposes. A party may bring suit and obtain a judgment for breach of contract even though they could also prove fraud, albeit with more time and effort. "Forcing a creditor to anticipate a hypothetical bankruptcy filing in his state court action on the debt and therefore to pursue all potential claims

relevant to discharge in addition those necessary to establish the debt would ... entail needless additional litigation." *In re McKendry*, 40 F.3d at 335. Mr. Hurston obtained judgment against Mr. Anzo in state court, the debt against Mr. Anzo has been established, and dischargeability is a solely separate issue which is governed by the Bankruptcy Code. Pursuant to § 523(c) and Federal Rule of Bankruptcy Procedure 4007(c), Mr. Hurston had sixty days after the first date set for the meeting of creditors under § 341(a) by which to file his complaint. In this case that date was March 6, 2015. Mr. Hurston filed this adversary proceeding on March 4, 2015, before the deadline provided in Rule 4007; therefore, because the Complaint was timely filed, this argument is without merit.

### B. Section 523(a)(2)(B)

■ The creditor objecting to dischargeability has the burden of proving by a preponderance of the evidence that a debt is non-dischargeable. *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir.1994). When objecting to dischargeability of a debt under § 523(a)(2)(B), the creditor must prove each individual element required by § 523(a)(2)(B) or the entire debt is dischargeable. *Id.* "[C]ourts generally construe the statutory exceptions to discharge in bankruptcy 'liberally in favor of the debtor,' and recognize that 'the reasons for denying a discharge ... must be real and substantial, not merely technical and conjectural." *Id.* (citations omitted). "This narrow construction ensures that 'the honest but unfortunate debtor' is afforded a fresh start." *Id.* (citations omitted).

■ Pursuant to § 523(a)(2)(B), a debt is excepted from discharge if it is

(2) for money, property services, or an extension, renewal, or refinancing of credit, to the extent [it was] obtained by [the]

. . . .

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B). In order for its debt to be declared non-dischargeable under § 523(a)(2)(B), a creditor must prove by a preponderance of the evidence that the debtor owes the creditor a debt for money, property, or the extension of credit that was obtained by the debtor through the use of: (1) a written statement; (2) the written statement was materially false; (3) the written statement concerns the debtor's financial condition; (4) the plaintiff reasonably relied on the statement; and (5) the debtor published the writing with the intent to deceive the plaintiff. *Bank of N. Ga. v. McDowell (In re McDowell)*, 497 B.R. 363, 369 (Bankr.N.D.Ga.2013).

### 1. Statement in Writing

■ "As long as the written statement is written, signed, adopted or used by the debtor, the basic precondition concerning the writing requirement to the non-dischargeability complaint under section 523(a)(2)(B) is met." *In re Michael*, 265 B.R. 593, 598 (Bankr.W.D.Tenn.2001). It need not be signed by the debtor, but the debtor must affirm the writing in some respect by using it or adopting it. *In re Phillips*, No. 06–2069, 2007 WL 1297011, at *4 (Bankr.C.D.Ill.2007). The Financial Statement in this case is clearly a state-

ment in writing and signed by Mr. Anzo and given to Mr. Hurston.

## 2. Materially False

■ To satisfy the "materially false" element of § 523(a)(2)(B), a plaintiff must show more than a "merely erroneous or untrue written statement." *In re Boice*, 149 B.R. 40, 45 (Bankr.S.D.N.Y.1992). A written statement is materially false if it "paints a substantially untruthful picture of financial conditions by misrepresenting information of the type that would normally affect the decision to grant credit." *In re Greene*, No. 13–5326, 2013 WL 6911376, at *2 (Bankr.N.D.Ga. Dec. 24, 2013) (citation omitted). "To be materially false under section 523(a)(2)(B), a false statement must be objectively material, meaning that it must misrepresent information of the type that normally affects the particular type of decision at issue." 4 Collier on Bankruptcy, ¶ 523,08[2][b]. A false statement can still be material "if it so substantial that a reasonable person would have relied upon it, even if the creditor did not *in fact* rely upon it in the case at hand." *In re Cohn*, 54 F.3d 1108, 1114 (3d Cir. 1995). Writings with pertinent omissions may qualify as 'materially false' for purposes of § 523(a)(2)(B). *In re Boice*, 149 B.R. at 45. In addition, writings disclosing the debtor's assets which the debtor does not actually own, or owns jointly, may qualify as being materially false. *See Bates v. Winfree (In re Winfree)*, 34 B.R. 879, 884 (Bankr.M.D.Tenn.1983); *Long Island Trust Co. v. Rodriguez (In re Rodriguez)*, 29 B.R. 537, 540 (Bankr.E.D.N.Y. 1983).

■ The parties do not dispute that the Financial Statement contained certain inaccuracies. The question becomes whether the inaccuracies in the Financial Statement are of the type that would affect the decision of an objective creditor to extend a loan for over $400,000. The Court concludes they are. The Financial Statement represented that Mr. Anzo's assets totaled $15,290,433. However, half of those assets were not actually owned by Mr. Anzo or were jointly owned with his wife. The Financial Statement did not mention his wife and was not signed by his wife. In addition, the Financial Statement represented that Mr. Azno had total liabilities of $2,785,319. The Financial Statement failed to account for almost $10 million in contingent liabilities from personal guaranties he signed. The Financial Statement represented that Mr. Anzo had a net worth at $12,505,114, but taking into account the aforementioned inaccuracies Mr. Azno's net worth was much less. The net worth of a guarantor is certainly the type of information that a creditor would consider when determining whether to extend a loan, particularly when, as in this case, the creditor requested that the guarantor sign a guaranty.[12] In addition, the dollar amount of the inaccuracies in the Financial Statement was significant enough to be material.

## 3. Concerning the Debtor's Financial Condition

The term "financial condition" is not defined in the Bankruptcy Code. Courts are split on whether the term should be defined narrowly to refer only to the debtor's overall financial condition such as net worth or solvency, or be defined more broadly to include representations regarding ownership of or encumbrances on an asset. *See Schneidermcm v. Bogdanovich (In re Bogdanovich)*, 292 F.3d 104, 112 (2d

---

12. The Court notes that Mr. Anzo argues that Mr. Hurston knew of some of the inaccuracies contained in the Financial Statement but that argument is more appropriately directed to the issue of reasonable reliance and not material falsity.

Cir.2002) (collecting cases). The Financial Statement in this case clearly is a writing concerning Mr. Anzo's financial condition regardless of which standard is used. It is entitled "Personal Net Worth Statement of Peter D. Anzo" and contains a clear list of his assets and liabilities as of January 1, 2009. Even applying the narrow definition of "financial condition," the Financial Statement in this case meets the criteria.

### 4. Reasonable Reliance

 For a debt to be nondischargeable pursuant to § 523(a)(2)(B), the creditor's reliance must have been both actual and reasonable. A financial statement does not have to be the only factor influencing a creditor; partial reliance is all that is needed. *In re Robinson*, 192 B.R. 569, 576 (Bankr.N.D.Ala.1996). "The reasonable reliance analysis is done on a case-by-case basis considering the totality of circumstances." *In re McDowell*, 497 B.R. at 370. In looking at the totality of the circumstances, a court should consider whether: (1) the creditor followed its established lending procedure in renewing the loan application; (2) the creditor verified the financial statements through outside sources; (3) even minimal investigation would have revealed the inaccuracy of the debtor's representations; (4) the creditor had previous or close personal relationship or friendship with the debtor; (4) the financial statements contained any "red flags" that should have alerted the creditor to potential inaccuracies; and (5) whether the debt was incurred for personal or commercial reasons. *Id.* at 371; *In re Purse*, 537 B.R. 28, 39 (Bankr.S.D.Ga.2015). "[R]easonable reliance connotes the use of the standard of ordinary and average person." *In re Davenport*, 508 Fed.Appx. 937, 938 (11th Cir.2013) (unpublished). It is a more stringent standard than justifiable reliance or actual reliance. *In re Vann*, 67 F.3d 277, 280 (11th Cir.1995).

Mr. Anzo argues that Mr. Hurston did not reasonably rely on the Financial Statement and that the June 2009 Note was not "obtained by" the Financial Statement because it was provided in January 2009 in connection with the January 2009 Note and it was stale by the time it was relied on in June 2009. Mr. Hurston argues that he put Mr. Anzo on notice that he was relying on the Financial Statement prior to the execution of the June 2009 Note because it was referenced it in his May Default Letter, and even if not, Mr. Anzo reaffirmed its accuracy in the Guaranty Agreement.

 Courts have found reliance to be unreasonable when a creditor relies on a financial statement that becomes stale by the passage of time. *See, e.g., In re McCleary*, 284 B.R. 876 (Bankr.N.D.Iowa 2002) (concluding that a year old financial statement was stale and creditor could not reasonably rely on it); *In re Benton*, 367 B.R. 592, 599 (Bankr.S.D.Ohio 2006) (concluding two year old financial statement was stale at time loan was made); *In re Schraw*, 136 B.R. 301 (Bankr.S.D.Fla. 1992). However, even if a financial statement becomes stale by the passage of time, if the debtor reaffirms that his or her financial condition has not changed since the earlier financial statement, any staleness may be cured. *See In re Robinson*, 192 B.R. 569, 576 (Bankr.N.D.Ala.1996) (concluding debtor's verbal representation that financial condition had not changed cured any staleness argument); *In re Jemal*, 516 B.R. 238, 248 (Bankr.E.D.N.Y. 2014).

 In this case, the Financial Statement is dated as of January 1, 2009 and Mr. Hurston agreed to the June 2009 Note in late June 2009. The Guaranty Agreement signed by Mr. Anzo in conjunction with the June 2009 Note states: "if Guar-

antor or Borrow has delivered to Lender financial statements of Guarantor, there has been no material adverse change in the financial condition of Guarantor from the financial condition of Guarantor shown on such financial statement delivered to Lender." (Hurston Aff. Ex. J, ¶ 7). The statement contained in the Guaranty Agreement regarding no change in Mr. Anzo's financial condition cures any staleness of the Financial Statement that may have existed. The effect of this provision in the Guaranty Agreement stating that here has been no change in Anzo's financial condition is not diminished by Mr. Hurston's knowledge of some inaccuracies in the Financial Statement at that time, although that knowledge may be relevant with respect to other issues. While this provision in the Guaranty Agreement is broad, it sufficiently includes the Financial Statement that was delivered to Mr. Hurston and affirms that no adverse changes have occurred since providing that Financial Statement. Accordingly, the Court cannot find as a matter of law that the Financial Statement was stale.

The Court also cannot find as a matter of law that the June 2009 Note was not "obtained by" the Financial Statement. Although Mr. Anzo provided the Financial Statement to Mr. Hurston in conjunction with the January 2009 Note, the language contained in the Guaranty Agreement put Mr. Anzo on notice that Mr. Hurston was potentially relying on prior financial statements provided to him, including the Financial Statement. Although the Financial Statement was provided in conjunction with the January 2009 Note, it was reaffirmed so that Mr. Anzo should have been put on notice of potential reliance on the Financial Statement. But questions of fact also exist as to whether the extension was "obtained by" the Financial Statement, both with respect to whether Mr. Hurston actually relied on it and, if so,

whether his reliance upon it was reasonable.

Mr. Azno also argues that any reliance on the Financial Statement was not reasonable as a matter of law because Mr. Hurston knew of at least some of the inaccuracies in the Financial Statement from the E-mails the parties exchanged in which Mr. Hurston was informed that Mr. Anzo did not own the Lake House and only jointly owned the Condo with his wife. Mr. Anzo contends Mr. Hurston's knowledge of such inaccuracies are red flags that should have alerted Mr. Hurston to other potential inaccuracies in the Financial Statement. "The existence of a 'red flag' which would put a reasonably prudent person on notice that the information contained in the financial statement may not be accurate is a key factor in the reasonable reliance test under § 523(a)(2)(B)." *In re Turner*, 358 B.R. 422, 427 (Bankr.N.D.Okla.2006). A creditor cannot ignore red flags that suggest inaccuracies, and should undertake at least some minimal investigation as to the representations contained in a financial statement with red flags. *See In re Smith*, 278 B.R. 532 (Bankr.N.D.Okla.2002) (concluding no reasonable reliance when bank failed to undertake even minimal investigation of representations contained in financial statement when incomplete financial statement with information which would bring into question accuracy of information); *In re Kuranda*, 122 B.R. 264, 269 (Bankr.E.D.Va.1990) ("A creditor cannot ignore 'red flags' and expect to benefit from nondischargeability"). When red flags exists that indicate a financial statement lacks accuracy, it creates a necessity for additional minimal investigation by the creditor. *In re Benton*, 367 B.R. 592, 599 (Bankr.S.D.Oh.2006); *but see In re Norris*, 70 F.3d 27, 30 (5th Cir.1995) ("[F]inding that the only obvious substantial error,

an overestimation of the value of the ... real estate, was one of which the bank already was aware ... [a finding] that the flawed financial statement was not such a red flag as to invoke a duty to investigate ... [was] adequately supported by the record."); *In re Young,* 995 F.2d 547, 549 (5th Cir.1993) (existence of whiteouts and handwritten additions to a financial statement which was typed not such a red flag to invoke a duty to investigate).

In October 2008, about a month after Lehman Brothers filed for bankruptcy and about one week after the President signed the TARP bill to shore up the financial markets allegedly to prevent a collapse of the country's financial markets, the parties exchanged the E-mails wherein Mr. Anzo specifically told Mr. Hurston that he did not own the Lake House, but rather his wife did, and that the Condo was jointly owned by he and his wife, but that he generally had a net worth in excess of $10,000,000 without describing his other assets and liabilities. The E-mails were exchanged in October 2008 while the parties were negotiating an extension of the October 2007 Note. The Financial Statement was actually delivered in late January 2009 in connection with the January 2009 Note. The parties dispute whether the Financial Statement was a material part of the extension that was agreed upon or whether it was something that Mr. Hurston just wanted to have for the file, perhaps so he would have a list of assets he could pursue in the event he had to try to collect on the guaranty. The Financial Statement delivered to Mr. Hurston in January 2009 showed that Mr. Anzo was the sole owner of the Lake House and the Condo, which Mr. Hurston knew to be untrue based on the E-mails. It also showed a net worth in excess of $12,000,000, about $2,000,000 more than the general statement of net worth in the E-mails, despite the country's financial

turmoil. There were certainly other red flags on the face of the financial statement, including the failure to list the contingent liability to Mr. Hurston, himself, and the other substantial contingent obligations one would reasonably expect to be associated with the marina. By the time the Financial Statement was reaffirmed by Mr. Anzo in connection with the June 2009 Note, the country was clearly in a deep recession and the real estate markets were destabilized at best and it was extremely difficult to finance a real estate or commercial transaction. Based on this reaffirmation of the Financial Statement in connection with the June 2009 Note, Mr. Hurston asserts that he had no reason to believe that Mr. Anzo's net worth was not adversely affected by the recession, despite the fact that so many people in the country had suffered a significant drop in the value of their portfolios, particularly those who had assets like those on the Financial Statement which were real estate related. For example, a further question, or red flag, could be whether Mr. Anzo's interest in LaPrade's really could be worth as much as stated in the Financial Statement in such a difficult economic environment and when LaPrade's was unable to get refinancing that necessitated the repeated extensions of the loan from Mr. Hurston.

In response, Mr. Hurston argues that his reliance was reasonable because of his interactions with Mr. Anzo, because Mr. Anzo lived a "wealthy, lavish lifestyle," and because he reviewed the Financial Statement carefully and it was consistent with Mr. Anzo's prior representations. *See In re Bratcher,* 289 B.R. 205, 215 (Bankr. M.D.Fla.2003) (holding reliance was reasonable, in part because the debtor had a good reputation in the community and had a wealthy family with nice assets); *see also In re Davenport,* 508 Fed.Appx. 937, 938

(11th Cir.2013) (unpublished) (finding of reasonable reliance not clearly erroneous when, among other things, creditor took into account debtor's education, job, and family's reputation in the community).

While courts have concluded that one of the factors that may be considered when looking at the totality of the circumstances on this issue is the debtor's reputation in the community and if the debtor lives a wealthy lifestyle, questions of fact exist regarding (a) whether Mr. Hurston was relying on that lifestyle and reputation instead of the Financial Statement or whether it was reasonable for that lifestyle and reputation to be the basis for reliance on the Financial Statement under the circumstances and (b) the extent to which Mr. Hurston conducted any further minimal investigation into the accuracy of the Financial Statement or whether his reliance on lifestyle and reputation were sufficient in lieu of any further investigation if that is all he relied on other than a Financial Statement that he knew had some errors and omissions in it. Mr. Hurston asserts that most of the assets contained in the Financial Statement were assets that were not easily verifiable and that he was not concerned with the ownership of the Lake House and Condo in light of Mr. Anzo's representation that the bulk of his assets were not personal residences. It is true that ownership of interests in privately held companies cannot be verified on a public record like real estate as asserted by Mr. Hurston. But was it reasonable for Mr. Hurston to have assumed that Mr. Anzo accurately stated that he owned those interests when he knew the Financial Statement incorrectly reported Mr. Anzo's ownership interest in the Lake House and Condo? Would it have been more reasonable to assume the exact opposite to be true in such a situation or at least ask for more information, such as requesting tax returns with schedules and K–1's that would have showed who, if anyone, owned interests in these privately held companies?

 Although this Court is aware that other courts have decided the issue of reasonable reliance in favor of both the creditor and the debtor on summary judgment, the issue of reasonable reliance is generally a question of fact and it involves the credibility of the parties, the latter of which is not appropriate to determine on summary judgment. *Hairston,* 9 F.3d 913, 919 (11th Cir.1993) Based on the record before the Court, the Court cannot rule as a matter of law that Mr. Hurston's reliance was reasonable or unreasonable or that the extension of the note was "obtained by" the Financial Statement.

### 5. Intent to Deceive

 The issue of whether a debtor acted with the intent to deceive is a question of fact. *In re Miller,* 39 F.3d at 304. Bankruptcy courts look to the totality of the circumstances, including the recklessness of a debtor's behavior, to infer whether a debtor submitted a statement with the intent to deceive. *Id.* at 305. "Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inference of intent to deceive." *Id.* (citations omitted) (internal quotation marks omitted). Finding of a reckless disregard should be narrowly interpreted. *In re Cascio,* 318 B.R. 567, 575 (Bankr.D.Kan.2004). "The statutory exception to the discharge of debts for money obtained by a materially false financial statement is meant to apply to those debtors who act with dishonest intent and not to those who are merely 'careless or presumptuous.'" *Id.; see also In re Miller,* 39 F.3d at 305–06 (finding careless and presumptuous estimates can be made with-

out dishonest intent). The omissions of substantial contingent liabilities which are not merely oversights can serve as evidence of an intent to deceive. *In re Martin*, 299 B.R. 234, 243 (Bankr.C.D.Ill.2003) (inferring intent to deceive when sophisticated borrower that failed to disclose $23 million in contingent liability because business for which he guaranteed debt was doing well). But the omission of liabilities does not *per se* result in an inference of an intent to deceive. *See In re Miller*, 39 F.3d at 306 (concluding bankruptcy court's finding of lack of intent to deceive not clearly erroneous despite fact that debtor failed to list $1.5 million in promissory notes in financial statement).

Mr. Anzo alleges that the inaccuracies contained in the Financial Statement were due to his use of an old form on his computer which included his wife's assets for prior financing purposes. He contends that he left off the contingent debts totaling $10 million because those were based on guaranties he did not think he would ever need to pay due to the alleged value of LaPrade's. If Mr. Anzo had previously drafted a financial statement in order to obtain financing, it would make sense for him to simply update a prior document already created. Spouses often co-mingle or jointly own their assets, but it is certainly a fair question to ask Mr. Anzo why he made the effort to take his wife's name off the Financial Statement when he submitted it to Mr. Hurston without adjusting the assets or disclosures on account of removing her name.

At this stage, the Court cannot conclude as a matter of law that Mr. Anzo did or did not have the intent to deceive Mr. Hurston with the Financial Statement. Nor does the Court have sufficient evidence that Mr. Anzo did or did not exercise such reckless disregard for the truth of the disclosures in the Financial Statement to infer he had an intent to deceive Mr. Hurston as a matter of law, especially in light of the fact that when Mr. Hurston inquired as to the ownership of Mr. Anzo's real estate, albeit prior to receiving the Financial Statement, it appears Mr. Anzo informed Mr. Hurston that he did not own the Lake House and only jointly owned the Condo. While he also indicated that the bulk of his assets were not in personal residences, he was upfront regarding his lack of ownership of the residences which were then included as his assets on the Financial Statement. The parties also dispute the purpose of why the Financial Statement was provided. Based upon the evidence as it is now, the Court cannot conclude, for purposes of summary judgment, whether Mr. Anzo published the Financial Statement with the intent to deceive Mr. Hurston. This is an issue that requires a determination of the credibility of the parties so the Court will not determine it on summary judgment.

### 6. Damages

Mr. Anzo argues that even if Mr. Hurston meets all other elements of § 523(a)(2)(B), he cannot show that he was damaged by the Financial Statement because he did not loan any additional money in connection with the January 2009 Note or the June 2009 Note. He contends that even if Mr. Hurston never agreed to a renewal in June 2009 he would be in the same position as he is today, and thus cannot prove damages.

A split among courts exists as to whether § 523(a)(2)(B) includes an additional requirement that the creditor must show a detriment or damages. The majority of courts, particularly appellate courts, hold that a separate damages requirement is not necessary for a claim under § 523(a)(2)(B), relying on the plain words of the statute which does not include a damages requirement. *See In re Good-*

*rich*, 999 F.2d 22, 25–26 (1st Cir.1993) (holding that § 523(a)(2)(B) does not require the creditor to show a detriment or damages); *In re Campbell*, 159 F.3d 963 (6th Cir.1998) (holding a contractual refinancing or extension of credit is sufficient without showing further damages to have a debt declared non-dischargeable pursuant to § 523(a)(2)(B)); *In re McFarland*, 84 F.3d 943 (7th Cir.1996) (concluding § 523(a)(2)(B) does not contain a separate detriment requirement and courts should not add such a requirement); *In re Norris*, 70 F.3d 27 (5th Cir.1995) (concluding renewal of credit falls within the exception to discharge pursuant to § 523(a)(2)(B). Conversely, some courts liken a claim under § 523(a)(2)(B) to a common law tort and conclude a plaintiff must show the loss was proximately caused by the financial statement. See *In re Siriani*, 967 F.2d 302 (9th Cir.1992) (concluding creditor had to show that the fraud proximately caused its loss by adducing evidence that it relied on the financial statements, that it had valuable collection remedies at the time of renewal, and that such remedies lost value during the renewal period); *In re Johnson*, 242 B.R. 283, 292–93 (Bankr. E.D.Penn.1999) ("We can conceive no reason why the common law requirement of proof of resulting injury as the proximate cause as a necessary element of a successful fraud claim should not carry over to § 523(a)(2)(B) as well as § 523(a)(2)(A)").

The Eleventh Circuit has explained that § 523(a)(2)(B) contains an implied proximate causation requirement. *In re Collins*, 946 F.2d 815, 816 (11th Cir.1991) ("Collins correctly asserts that there is a causation requirement implied in the exception to discharge provided in § 523(a)(2)(B)."). Specifically, the Eleventh Circuit found "no error in the bankruptcy court's finding that Collins's false statements were the proximate cause of Palm Beach's harm." *Id.* at 817. At a certain level, this can be read to hold that to establish causation, an objecting creditor must show that it sustained a loss as a result of the representation. *Id.* The question is, though, what does that finding by the Eleventh Circuit mean in the context of the specific facts before the court in *Collins* ?

In *Collins*, the debtor provided a false financial statement in which he represented that certain collateral was free and clear when in fact it had been pledged twice before, although neither of the prior creditors perfected its security interest. The plaintiff also did not perfect its security interest. The plaintiff was unable to foreclose on the property and was not the superior lienholder because of its failure to perfect its security interest. The debtor argued that the false financial statement did not cause the plaintiff's harm, but rather that the plaintiff caused its own harm by not perfecting its interest in the collateral. The Eleventh Circuit explained that the Bankruptcy Code does not require such diligence from creditors induced by fraudulent means into extending credit to a debtor. It concluded that the false representations as to the status of the collateral were the proximate cause of the plaintiff's harm because without them the plaintiff would not have entered into the transaction with the debtor, which transaction involved the loaning of new money and Plaintiff, therefore, would not have suffered a loss.

In the case before this Court, the money had already been loaned by Mr. Hurston by the time the Financial Statement was provided to him, so the issue is to what extent does the Mr. Hurston have to show actual pecuniary loss from the receipt of, and reliance on, a false financial statement in the context of an extension or renewal of a loan as opposed to showing he would not have entered into the renewal or ex-

tension absent the false financial statement without regard to whether he suffered any actual pecuniary loss as a result of the renewal or extension.

In *In re Norris*, the Fifth Circuit commented on the Eleventh Circuit's proximate cause discussion in *Collins*. 70 F.3d 27, 29 n.6 (5th Cir.1995) The Fifth Circuit opined that the Eleventh Circuit did not create a separate proximate causation requirement, but rather merely applied the already existing statutory mandate that debts are nondischargeable "to the extent obtained by" the fraudulent representation. *Id.*

This Court agrees with the Fifth Circuit in *Norris* that the proximate causation requirement mentioned in *Collins* is simply applying the already existing statutory requirement that the debt, or its extension or renewal, must be "obtained by" the false financial statement, and not creating a separate damages requirement. The Supreme Court affirmed such a reading of the statute in *Field v. Mans* when it stated that the "obtained by" language does in fact create an implied causation requirement. 516 U.S. 59, 66, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). In *Field*, the Supreme Court resolved a split among courts as to the proper reliance standard that should be applied in a claim under § 523(a)(2)(A), and concluded that a justifiable reliance standard applies. In so concluding, the court had to differentiate between § 523(a)(2)(A) and § 523(a)(2)(B) since § 523(a)(2)(B) contains a reasonable reliance standard. It differentiated between the two sections in an important way relevant to this issue. It explained that § 523(a)(2)(B) is not "traceable to another context where it might have been construed to include elements that need not be set out separately." 516 U.S. at 69, 116 S.Ct. 437. Thus, "[i]f other elements are to be added to 'statement in writing,'

the statutory language must add them." *Id.* On the other hand, the operative terms in § 523(a)(2)(A), " 'false pretenses, a false representation, or actual fraud,' carry the acquired meaning of terms of art[;] [t]hey are common-law terms, and ... they imply elements that the common law has defined them to include." *Id.* The court concluded that, because Congress did not dictate otherwise in the statute, § 523(a)(2)(A) adopts a common-law understanding of the terms it used. *Id.* at 69–70, 116 S.Ct. 437. Following common law, § 523(a)(2)(A) requires a creditor to prove damages just as the common law tort of fraud contains such an element. *See, e.g., In re Bilzerian*, 153 F.3d 1278, 1282 (11th Cir.1998); *In re Wood*, 245 Fed.Appx. 916, 917–18 (11th Cir.2007) (unpublished).

While some courts requiring a creditor to prove damages in a claim under § 523(a)(2)(B) look to *Field* for the principle that they should apply common law, as the Court just discussed, the Supreme Court also explained that § 523(a)(2)(B) does not refer to a common law tort and the elements for the debts to be declared nondischargeable under that section must be in the statutory language. In § 523(a)(2)(B), Congress clearly laid out all elements required for a debt to be declared nondischargeable; excluded from the list of required elements is one for damages. Congress certainly was aware that damages could be an element added to § 523(a)(2)(B), but specifically did not include such a requirement. Congress enacted a detailed statute without a damage requirement. Whether to require such an element in the statute is a policy choice that should be left to Congress. *See In re Goodrich*, 999 F.2d at 25–26. By contrast, the statute contains a clear causation requirement with the language requiring the debt to be "obtained by" the use of a materially false statement regarding the debtor's financial condition.

In *Field,* the Supreme Court hypothesized as to why Congress provided the more stringent reasonable reliance requirement for § 523(a)(2)(B) in contrast to the lesser justifiable reliance standard of § 523(a)(2)(A). It explained that Congress might have provided a stricter standard to balance the equities that are affected by the practices of the consumer finance industry, such as encouraging falsity by their borrowers for the purpose of insulating their own claims from discharge. *Field v. Mans,* 516 U.S. at 77, 116 S.Ct. 437. In this Court's view, it makes sense why Congress did not also require a showing of damages once a creditor is able to prove the more stringent reasonable reliance and an intent to deceive, because at that point the statute should not seek to help the dishonest debtor by also requiring a showing of damages. "To hold otherwise would create a perverse incentive for insolvent debtors to lie to creditors to get them to forbear collection of past due indebtedness and would remove the primary legal incentive for fair dealing namely, nondischargeability in bankruptcy when a contract is induced by fraud." *In re Campbell,* 159 F.3d at 967. "A borrower's incentive to act with integrity should not end once he becomes insolvent" such that a creditor cannot show any valuable collection existed at the time of the renewal. *Id.* As the First Circuit put it,

> Congress could easily have concluded on policy grounds that a damage requirement was not appropriate. The debtor, by hypothesis, has caused the trouble by making a materially false statement with intent to deceive and the creditor has reasonably relied upon the statement in renewing the loan. Congress could have thought that making the bank shoulder the further burden of proving that it could have collected the loan prior to bankruptcy—a matter of solvency which the debtor has most the of information—

was not a proper addition to the compromises reflected in section 523(a)(2)(B). *In re Goodrich,* 999 F.2d at 26. Whether or not to require a showing of damages to have a debt declared non-dischargeable by way of § 523(a)(2)(B) was a policy decision which Congress made; therefore, Mr. Hurston is not required to prove a separate element of damages.

To the extent *Collins* can be broadly interpreted to require proof of an actual financial loss, this Court thinks that language is a product of the specific facts of that case. Had the false financial statement not been provided in *Collins,* the fact finder determined there would have been no financial loss because no loan would have been made so the false financial statement was, in fact, the proximate cause of the loss. The language used by the Eleventh Circuit fit the facts it had before it and the holding was certainly appropriate in that context. Had the issue in *Collins* been a renewal or extension of a loan, the facts would have necessitated the use of different language, but those were not the facts, so different language was not necessary.

In addition, the Court notes that a question of fact exists as to what Mr. Hurston could have collected, if anything, at the time he pursued his collection remedies instead of entering into the extensions in 2009, which questions of fact prevent this Court from granting summary judgment in Mr. Anzo's favor even if the Court were to hold that Mr. Hurston had to prove he suffered a financial loss on account of the extensions at issue in this case. This does not mean that this issue is not relevant: what he would have collected, or what he may have lost by delaying his collection activity, may be relevant to the issue of reasonable reliance on or the intent to deceive with respect to the Financial Statement.

## Conclusion

Accordingly, for the reasons stated herein, it is hereby

ORDERED that Mr. Hurston's Motion for Summary Judgment is DENIED; and it is

FURTHER ORDERED that Mr. Anzo's Motion for Summary Judgment is DENIED.